(Slip Opinion)          OCTOBER TERM, 2013          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* WOODS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 12–562.   Argued October 9, 2013—Decided December 3, 2013

Respondent Gary Woods and his employer, Billy Joe McCombs, partici-pated in an offsetting-option tax shelter designed to generate large paper losses that they could use to reduce their taxable income.  To that end, they purchased from Deutsche Bank a series of currency-option spreads.  Each spread was a package consisting of a long op-tion, which Woods and McCombs purchased from Deutsche Bank and for which they paid a premium, and a short option, which Woods and McCombs sold to Deutsche Bank and for which they received a pre-mium.  Because the premium paid for the long option was largely off-set by the premium received for the short option, the net cost of the package to Woods and McCombs was substantially less than the cost of the long option alone.  Woods and McCombs contributed the spreads, along with cash, to two partnerships, which used the cash to purchase stock and currency.  When calculating their basis in the partnership interests, Woods and McCombs considered only the long component of the spreads and disregarded the nearly offsetting short component.  As a result, when the partnerships' assets were disposed of for modest gains, Woods and McCombs claimed huge losses.  Al-though they had contributed roughly $3.2 million in cash and spreads to the partnerships, they claimed losses of more than $45 million.

The Internal Revenue Service sent each partnership a Notice of Final Partnership Administrative Adjustment, disregarding the partnerships for tax purposes and disallowing the related losses.  It concluded that the partnerships were formed for the purpose of tax avoidance and thus lacked "economic substance," *i.e.,* they were shams.  As there were no valid partnerships for tax purposes, the IRS determined that the partners could not claim a basis for their part-nership interests greater than zero and that any resulting tax under-

payments would be subject to a 40-percent penalty for gross valua-
tion misstatements.  Woods sought judicial review.  The District
Court held that the partnerships were properly disregarded as shams
but that the valuation-misstatement penalty did not apply.  The Fifth
Circuit affirmed.

*Held*:

 1. The District Court had jurisdiction to determine whether the
partnerships' lack of economic substance could justify imposing a
valuation-misstatement penalty on the partners.  Pp. 6–11.

 (a) Because a partnership does not pay federal income taxes, its
taxable income and losses pass through to the partners.  Under the
Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), the IRS
initiates partnership-related tax proceedings at the partnership level
to adjust "partnership items," *i.e.,* items relevant to the partnership
as a whole.  26 U. S. C. §§6221, 6231(a)(3).  Once the adjustments be-
come final, the IRS may undertake further proceedings at the part-
ner level to make any resulting "computational adjustments" in the
tax liability of the individual partners.      §§6230(a)(1)–(2), (c),
6231(a)(6).  Pp. 6–7.

 (b) Under TEFRA's framework, a court in a partnership-level
proceeding has jurisdiction to determine "the applicability of any
penalty . . . which relates to an adjustment to a partnership item."
§6226(f).  A determination that a partnership lacks economic sub-
stance is such an adjustment.  TEFRA authorizes courts in partner-
ship-level proceedings to provisionally determine the applicability of
any penalty that could result from an adjustment to a partnership
item, even though imposing the penalty requires a subsequent, part-
ner-level proceeding.  In that later proceeding, each partner may
raise any reasons why the penalty may not be imposed on him specif-
ically.  Applying those principles here, the District Court had juris-
diction to determine the applicability of the valuation-misstatement
penalty.  Pp. 7–11.

 2. The valuation-misstatement penalty applies in this case.
Pp. 11–16.

 (a) A penalty applies to the portion of any underpayment that is
"attributable to" a "substantial" or "gross" "valuation misstatement,"
which exists where "the value of any property (or the adjusted basis
of any property) claimed on any return of tax" exceeds by a specified
percentage "the amount determined to be the correct amount of such
valuation or adjusted basis (as the case may be)."  §§6662(a), (b)(3),
(e)(1)(A), (h).  The penalty's plain language makes it applicable here.
Once the partnerships were deemed not to exist for tax purposes, no
partner could legitimately claim a basis in his partnership interest
greater than zero.  Any underpayment resulting from use of a non-

Syllabus

zero basis would therefore be "attributable to" the partner's having claimed an "adjusted basis" in the partnerships that exceeded "the correct amount of such . . . adjusted basis." §6662(e)(1)(A). And under the relevant Treasury Regulation, when an asset's adjusted basis is zero, a valuation misstatement is automatically deemed gross. Pp. 11–12.

(b) Woods' contrary arguments are unpersuasive. The valuation-misstatement penalty encompasses misstatements that rest on legal as well as factual errors, so it is applicable to misstatements that rest on the use of a sham partnership. And the partnerships' lack of economic substance is not an independent ground separate from the misstatement of basis in this case. Pp. 12–16.

471 Fed. Appx. 320, reversed.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–562

UNITED STATES, PETITIONER *v.* GARY WOODS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[December 3, 2013]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether the penalty for tax underpayments attributable to valuation misstatements, 26 U. S. C. §6662(b)(3), is applicable to an underpayment resulting from a basis-inflating transaction subsequently disregarded for lack of economic substance.

## I. The Facts

### A

This case involves an offsetting-option tax shelter, variants of which were marketed to high-income taxpayers in the late 1990's. Tax shelters of this type sought to generate large paper losses that a taxpayer could use to reduce taxable income. They did so by attempting to give the taxpayer an artificially high basis in a partnership interest, which enabled the taxpayer to claim a significant tax loss upon disposition of the interest. See IRS Notice 2000–44, 2000–2 Cum. Bull. 255 (describing offsetting-option tax shelters).

The particular tax shelter at issue in this case was developed by the now-defunct law firm Jenkens & Gilchrist and marketed by the accounting firm Ernst &

Young under the name "Current Options Bring Reward Alternatives," or COBRA. Respondent Gary Woods and his employer, Billy Joe McCombs, agreed to participate in COBRA to reduce their tax liability for 1999. To that end, in November 1999 they created two general partnerships: one, Tesoro Drive Partners, to produce ordinary losses, and the other, SA Tesoro Investment Partners, to produce capital losses.

Over the next two months, acting through their respective wholly owned, limited liability companies, Woods and McCombs executed a series of transactions. First, they purchased from Deutsche Bank five 30-day currency-option spreads. Each of these option spreads was a package consisting of a so-called long option, which entitled Woods and McCombs to receive a sum of money from Deutsche Bank if a certain currency exchange rate exceeded a certain figure on a certain date, and a so-called short option, which entitled Deutsche Bank to receive a sum of money from Woods and McCombs if the exchange rate for the same currency on the same date exceeded a certain figure so close to the figure triggering the long option that both were likely to be triggered (or not to be triggered) on the fated date. Because the premium paid to Deutsche Bank for purchase of the long option was largely offset by the premium received from Deutsche Bank for sale of the short option, the net cost of the package to Woods and McCombs was substantially less than the cost of the long option alone. Specifically, the premiums paid for all five of the spreads' long options totaled $46 million, and the premiums received for the five spreads' short options totaled $43.7 million, so the net cost of the spreads was just $2.3 million. Woods and McCombs contributed the spreads to the partnerships along with about $900,000 in cash. The partnerships used the cash to purchase assets—Canadian dollars for the partnership that sought to produce ordinary losses, and Sun Microsystems stock

for the partnership that sought to produce capital losses. The partnerships then terminated the five option spreads in exchange for a lump-sum payment from Deutsche Bank.

As the tax year drew to a close, Woods and McCombs transferred their interests in the partnerships to two S corporations. One corporation, Tesoro Drive Investors, Inc., received both partners' interests in Tesoro Drive Partners; the other corporation, SA Tesoro Drive Investors, Inc., received both partners' interests in SA Tesoro Investment Partners. Since this left each partnership with only a single partner (the relevant S corporation), the partnerships were liquidated by operation of law, and their assets—the Canadian dollars and Sun Microsystems stock, plus the remaining cash—were deemed distributed to the corporations. The corporations then sold those assets for modest gains of about $2,000 on the Canadian dollars and about $57,000 on the stock. But instead of gains, the corporations reported huge losses: an ordinary loss of more than $13 million on the sale of the Canadian dollars and a capital loss of more than $32 million on the sale of the stock. The losses were allocated between Woods and McCombs as the corporations' co-owners.

The reason the corporations were able to claim such vast losses—the alchemy at the heart of an offsetting-options tax shelter—lay in how Woods and McCombs calculated the tax basis of their interests in the partnerships. Tax basis is the amount used as the cost of an asset when computing how much its owner gained or lost for tax purposes when disposing of it. See J. Downes & J. Goodman, Dictionary of Finance and Investment Terms 736 (2010). A partner's tax basis in a partnership interest— called "outside basis" to distinguish it from "inside basis," the partnership's basis in its own assets—is tied to the value of any assets the partner contributed to acquire the interest. See 26 U. S. C. §722. Collectively, Woods and

McCombs contributed roughly $3.2 million in option spreads and cash to acquire their interests in the two partnerships. But for purposes of computing outside basis, Woods and McCombs considered only the long component of the spreads and disregarded the nearly offsetting short component on the theory that it was "too contingent" to count. Brief for Respondent 14. As a result, they claimed a total adjusted outside basis of more than $48 million. Since the basis of property distributed to a partner by a liquidating partnership is equal to the adjusted basis of the partner's interest in the partnership (reduced by any cash distributed with the property), see §732(b), the inflated outside basis figure was carried over to the S corporations' basis in the Canadian dollars and the stock, enabling the corporations to report enormous losses when those assets were sold. At the end of the day, Woods' and McCombs' $3.2 million investment generated tax losses that, if treated as valid, could have shielded more than $45 million of income from taxation.

### B

The Internal Revenue Service, however, did not treat the COBRA-generated losses as valid. Instead, after auditing the partnerships' tax returns, it issued to each partnership a Notice of Final Partnership Administrative Adjustment, or "FPAA." In the FPAAs, the IRS determined that the partnerships had been "formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of [the] purported partners." App. 92, 146. Because the partnerships had "no business purpose other than tax avoidance," the IRS said, they "lacked economic substance"—or, put more starkly, they were "sham[s]"—so the IRS would disregard them for tax purposes and disallow the related losses. *Ibid.* And because there were no valid partnerships for tax purposes, the IRS determined that the partners had

"not established adjusted bases in their respective partnership interests in an amount greater than zero," *id.,* at 95, ¶7, 149, ¶7 so that any resulting tax underpayments would be subject to a 40-percent penalty for gross valuation misstatements, see 26 U. S. C. §6662(b)(3).

Woods, as the tax-matters partner for both partnerships, sought judicial review of the FPAAs pursuant to §6226(a). The District Court held that the partnerships were properly disregarded as shams but that the valuation-misstatement penalty did not apply. The Government appealed the decision on the penalty to the Court of Appeals for the Fifth Circuit. While the appeal was pending, the Fifth Circuit held in a similar case that, under Circuit precedent, the valuation-misstatement penalty does not apply when the relevant transaction is disregarded for lacking economic substance. *Bemont Invs., LLC* v. *United States*, 679 F. 3d 339, 347–348 (2012). In a concurrence joined by the other members of the panel, Judge Prado acknowledged that this rule was binding Circuit law but suggested that it was mistaken. See *id.,* at 351–355. A different panel subsequently affirmed the District Court's decision in this case in a one-paragraph opinion, declaring the issue "well settled." 471 Fed. Appx. 320 (*per curiam*), reh'g denied (2012).[1]

We granted certiorari to resolve a Circuit split over whether the valuation-misstatement penalty is applicable in these circumstances. 569 U. S. \_\_\_ (2013). See *Bemont*, *supra*, at 354–355 (Prado, J., concurring) (recognizing "near-unanimous opposition" to the Fifth Circuit's rule). Because two Courts of Appeals have held that District Courts lacked jurisdiction to consider the valuation-

———————

[1] The District Court held that the partnerships did not have to be "honored as legitimate for tax purposes" because they did not possess "'economic substance.'" App. to Pet. for Cert. 19a. Woods did not appeal the District Court's application of the economic-substance doctrine, so we express no view on it.

misstatement penalty in similar circumstances, see *Jade Trading, LLC* v. *United States*, 598 F. 3d 1372, 1380 (CA Fed. 2010); *Petaluma FX Partners, LLC* v. *Commissioner*, 591 F. 3d 649, 655–656 (CADC 2010), we ordered briefing on that question as well.

## II. District-Court Jurisdiction
### A

We begin with a brief explanation of the statutory scheme for dealing with partnership-related tax matters. A partnership does not pay federal income taxes; instead, its taxable income and losses pass through to the partners. 26 U. S. C. §701. A partnership must report its tax items on an information return, §6031(a), and the partners must report their distributive shares of the partnership's tax items on their own individual returns, §§702, 704.

Before 1982, the IRS had no way of correcting errors on a partnership's return in a single, unified proceeding. Instead, tax matters pertaining to all the members of a partnership were dealt with just like tax matters pertaining only to a single taxpayer: through deficiency proceedings at the individual-taxpayer level. See generally §§6211–6216 (2006 ed. and Supp. V). Deficiency proceedings require the IRS to issue a separate notice of deficiency to each taxpayer, §6212(a) (2006 ed.), who can file a petition in the Tax Court disputing the alleged deficiency before paying it, §6213(a). Having to use deficiency proceedings for partnership-related tax matters led to duplicative proceedings and the potential for inconsistent treatment of partners in the same partnership. Congress addressed those difficulties by enacting the Tax Treatment of Partnership Items Act of 1982, as Title IV of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). 96 Stat. 648 (codified as amended at 26 U. S. C. §§6221–6232 (2006 ed. and Supp. V)).

Under TEFRA, partnership-related tax matters are

addressed in two stages. First, the IRS must initiate proceedings at the partnership level to adjust "partnership items," those relevant to the partnership as a whole. §§6221, 6231(a)(3). It must issue an FPAA notifying the partners of any adjustments to partnership items, §6223(a)(2), and the partners may seek judicial review of those adjustments, §6226(a)–(b). Once the adjustments to partnership items have become final, the IRS may undertake further proceedings at the partner level to make any resulting "computational adjustments" in the tax liability of the individual partners. §6231(a)(6). Most computational adjustments may be directly assessed against the partners, bypassing deficiency proceedings and permitting the partners to challenge the assessments only in postpayment refund actions. §6230(a)(1), (c). Deficiency proceedings are still required, however, for certain computational adjustments that are attributable to "affected items," that is, items that are affected by (but are not themselves) partnership items. §§6230(a)(2)(A)(i), 6231(a)(5).

## B

Under the TEFRA framework, a court in a partnership-level proceeding like this one has jurisdiction to determine not just partnership items, but also "the applicability of any penalty . . . which relates to an adjustment to a partnership item." §6226(f). As both sides agree, a determination that a partnership lacks economic substance is an adjustment to a partnership item. Thus, the jurisdictional question here boils down to whether the valuation-misstatement penalty "relates to" the determination that the partnerships Woods and McCombs created were shams.

The Government's theory of why the penalty was triggered is based on a straightforward relationship between the economic-substance determination and the penalty. In

the Government's view, there can be no outside basis in a sham partnership (which, for tax purposes, does not exist), so any partner who underpaid his individual taxes by declaring an outside basis greater than zero committed a valuation misstatement. In other words, the penalty flows logically and inevitably from the economic-substance determination.

Woods, however, argues that because outside basis is not a partnership item, but an affected item, a penalty that would rest on a misstatement of outside basis cannot be considered at the partnership level. He maintains, in short, that a penalty does not relate to a partnership-item adjustment if it "requires a partner-level determination," regardless of "whether or not the penalty has a connection to a partnership item." Brief for Respondent 27.

Because §6226(f)'s "relates to" language is "essentially indeterminate," we must resolve this dispute by looking to "the structure of [TEFRA] and its other provisions." *Maracich* v. *Spears*, 570 U. S. ___, ___ (2013) (slip op., at 9) (internal quotation marks and brackets omitted). That inquiry makes clear that the District Court's jurisdiction is not as narrow as Woods contends. Prohibiting courts in partnership-level proceedings from considering the applicability of penalties that require partner-level inquiries would be inconsistent with the nature of the "applicability" determination that TEFRA requires.

Under TEFRA's two-stage structure, penalties for tax underpayment must be *imposed* at the partner level, because partnerships themselves pay no taxes. And imposing a penalty always requires some determinations that can be made only at the partner level. Even where a partnership's return contains significant errors, a partner may not have carried over those errors to his own return; or if he did, the errors may not have caused him to underpay his taxes by a large enough amount to trigger the penalty; or if they did, the partner may nonetheless have

acted in good faith with reasonable cause, which is a bar to the imposition of many penalties, see §6664(c)(1). None of those issues can be conclusively determined at the partnership level. Yet notwithstanding that every penalty must be imposed in partner-level proceedings after partner-level determinations, TEFRA provides that the *applicability* of some penalties must be determined at the partnership level. The applicability determination is therefore inherently provisional; it is always contingent upon determinations that the court in a partnership-level proceeding does not have jurisdiction to make. Barring partnership-level courts from considering the applicability of penalties that cannot be imposed without partner-level inquiries would render TEFRA's authorization to consider some penalties at the partnership level meaningless.

Other provisions of TEFRA confirm that conclusion. One requires the IRS to use deficiency proceedings for computational adjustments that rest on "affected items which require partner level determinations (other than penalties . . . that relate to adjustments to partnership items)." §6230(a)(2)(A)(i). Another states that while a partnership-level determination "concerning the applicability of any penalty . . . which relates to an adjustment to a partnership item" is "conclusive" in a subsequent refund action, that does not prevent the partner from "assert[ing] any partner level defenses that may apply." §6230(c)(4). Both these provisions assume that a penalty can relate to a partnership-item adjustment even if the penalty cannot be imposed without additional, partner-level determinations.

These considerations lead us to reject Woods' interpretation of §6226(f). We hold that TEFRA gives courts in partnership-level proceedings jurisdiction to determine the applicability of any penalty that could result from an adjustment to a partnership item, even if imposing the penalty would also require determining affected or non-

partnership items such as outside basis.  The partnership-level applicability determination, we stress, is provisional: the court may decide only whether adjustments properly made at the partnership level have the potential to trigger the penalty.  Each partner remains free to raise, in subsequent, partner-level proceedings, any reasons why the penalty may not be imposed on him specifically.

Applying the foregoing principles to this case, we conclude that the District Court had jurisdiction to determine the applicability of the valuation-misstatement penalty—to determine, that is, whether the partnerships' lack of economic substance (which all agree was properly decided at the partnership level) could justify imposing a valuation-misstatement penalty on the partners.  When making that determination, the District Court was obliged to consider Woods' arguments that the economic-substance determination was categorically incapable of triggering the penalty.  Deferring consideration of those arguments until partner-level proceedings would replicate the precise evil that TEFRA sets out to remedy: duplicative proceedings, potentially leading to inconsistent results, on a question that applies equally to all of the partners.

To be sure, the District Court could not make a formal adjustment of any partner's outside basis in this partnership-level proceeding.  See *Petaluma*, 591 F. 3d, at 655.  But it nonetheless could determine whether the adjustments it did make, including the economic-substance determination, had the potential to trigger a penalty; and in doing so, it was not required to shut its eyes to the legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, did not exist.  Each partner's outside basis still must be adjusted at the partner level before the penalty can be imposed, but that poses no obstacle to a partnership-level court's provisional consideration of whether the economic-substance determination is legally capable of triggering

the penalty.[2]

### III. Applicability of Valuation-Misstatement Penalty
### A

Taxpayers who underpay their taxes due to a "valuation misstatement" may incur an accuracy-related penalty. A 20-percent penalty applies to "the portion of any underpayment which is attributable to . . . [a]ny substantial valuation misstatement under chapter 1." 26 U. S. C. §6662(a), (b)(3). Under the version of the penalty statute in effect when the transactions at issue here occurred,

> "there is a substantial valuation misstatement under chapter 1 if . . . the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." §6662(e)(1)(A) (2000 ed.).

If the reported value or adjusted basis exceeds the correct

————————

[2] Some *amici* warn that our holding bodes an odd procedural result: The IRS will be able to assess the 40-percent penalty directly, but it will have to use deficiency proceedings to assess the tax underpayment upon which the penalty is imposed. See Brief for New Millennium Trading, LLC, et al. as *Amici Curiae* 12–13. That criticism assumes that the underpayment would not be exempt from deficiency proceedings because it would rest on outside basis, an "affected ite[m] . . . other than [a] penalt[y]," 26 U. S. C. §6230(a)(2)(A)(i). We need not resolve that question today, but we do not think *amici*'s answer necessarily follows. Even an underpayment attributable to an affected item is exempt so long as the affected item does not "require partner level determinations," *ibid.*; see *Bush* v. *United States*, 655 F. 3d 1323, 1330, 1333–1334 (CA Fed. 2011) (en banc); and it is not readily apparent why additional partner-level determinations would be required before adjusting outside basis in a sham partnership. Cf. *Petaluma FX Partners, LLC* v. *Commissioner*, 591 F. 3d 649, 655 (CADC 2010) ("If disregarding a partnership leads ineluctably to the conclusion that its partners have no outside basis, that should be just as obvious in partner-level proceedings as it is in partnership-level proceedings").

amount by at least 400 percent, the valuation misstatement is considered not merely substantial, but "gross," and the penalty increases to 40 percent. §6662(h).[3]

The penalty's plain language makes it applicable here. As we have explained, the COBRA transactions were designed to generate losses by enabling the partners to claim a high outside basis in the partnerships. But once the partnerships were deemed not to exist for tax purposes, no partner could legitimately claim an outside basis greater than zero. Accordingly, if a partner used an outside basis figure greater than zero to claim losses on his tax return, and if deducting those losses caused the partner to underpay his taxes, then the resulting underpayment would be "attributable to" the partner's having claimed an "adjusted basis" in the partnerships that exceeded "the correct amount of such . . . adjusted basis." §6662(e)(1)(A).

An IRS regulation provides that when an asset's true value or adjusted basis is zero, "[t]he value or adjusted basis claimed . . . is considered to be 400 percent or more of the correct amount," so that the resulting valuation misstatement is automatically deemed gross and subject to the 40-percent penalty. Treas. Reg. §1.6662–5(g), 26 CFR §1.6662–5(g) (2013).[4]

B

Against this straightforward application of the statute,

─────────

[3] Congress has since lowered the thresholds for substantial and gross misstatements to 150 percent and 200 percent, respectively. See Pension Protection Act of 2006, §1219(a)(1)–(2), 120 Stat. 1083.

[4] An *amicus* suggests that this regulation is in tension with the mathematical rule forbidding division by zero. See Brief for Prof. Amandeep S. Grewal as *Amicus Curiae* 20, n. 7; cf. *Lee's Summit* v. *Surface Transp. Bd.*, 231 F. 3d 39, 41–42 (CADC 2000) (discussing "problems posed by applying [a] 100% increase standard to a baseline of zero"). Woods has not challenged the regulation before this Court, so we assume its validity for purposes of deciding this case.

Woods' primary argument is that the economic-substance determination did not result in a "valuation misstatement." He asserts that the statutory terms "value" and "valuation" connote "a factual—rather than legal— concept," and that the penalty therefore applies only to factual misrepresentations about an asset's worth or cost, not to misrepresentations that rest on legal errors (like the use of a sham partnership). Brief for Respondent 35.

We are not convinced. To begin, we doubt that "value" is limited to factual issues and excludes threshold legal determinations. Cf. *Powers* v. *Commissioner*, 312 U. S. 259, 260 (1941) ("[W]hat criterion should be employed for determining the 'value' of the gifts is a question of law"); *Chapman Glen Ltd.* v. *Commissioner*, 140 T. C. No. 15, 2013 WL2319282, *17 (2013) ("[T]hree approaches are used to determine the fair market value of property," and "which approach to apply in a case is a question of law"). But even if "value" were limited to factual matters, the statute refers to "value" *or* "adjusted basis," and there is no justification for extending that limitation to the latter term, which plainly incorporates legal inquiries. An asset's "basis" is simply its cost, 26 U. S. C. §1012(a) (2006 ed., Supp. V), but calculating its "adjusted basis" requires the application of a host of legal rules, see §§1011(a) (2006 ed.), 1016 (2006 ed. and Supp. V), including specialized rules for calculating the adjusted basis of a partner's interest in a partnership, see §705 (2006 ed.). The statute contains no indication that the misapplication of one of those legal rules cannot trigger the penalty. Were we to hold otherwise, we would read the word "adjusted" out of the statute.

To overcome the plain meaning of "adjusted basis," Woods asks us to interpret the parentheses in the statutory phrase "the value of any property (or the adjusted basis of any property)" as a signal that "adjusted basis" is merely explanatory or illustrative and has no meaning inde-

pendent of "value." The parentheses cannot bear that much weight, given the compelling textual evidence to the contrary. For one thing, the terms reappear later in the same sentence sans parentheses—in the phrase "such valuation or adjusted basis." Moreover, the operative terms are connected by the conjunction "or." While that can sometimes introduce an appositive—a word or phrase that is synonymous with what precedes it ("Vienna or Wien," "Batman or the Caped Crusader")—its ordinary use is almost always disjunctive, that is, the words it connects are to "be given separate meanings." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979). And, of course, there is no way that "adjusted basis" could be regarded as synonymous with "value." Finally, the terms' second disjunctive appearance is followed by "as the case may be," which eliminates any lingering doubt that the preceding items are alternatives. See New Oxford American Dictionary 269 (3d ed. 2010). The parentheses thus do not justify "rob[bing] the term ['adjusted basis'] of its independent and ordinary significance." *Reiter*, *supra,* at 338–339.

Our holding that the valuation-misstatement penalty encompasses legal as well as factual misstatements of adjusted basis does not make superfluous the new penalty that Congress enacted in 2010 for transactions lacking in economic substance, see §1409(b)(2), 124 Stat. 1068–1069 (codified at 26 U. S. C. §6662(b)(6) (2006 ed., Supp. V)). The new penalty covers all sham transactions, including those that do not cause the taxpayer to misrepresent value or basis; thus, it can apply in situations where the valuation-misstatement penalty cannot. And the fact that both penalties are potentially applicable to sham transactions resulting in valuation misstatements is not problematic. Congress recognized that penalties might overlap in a given case, and it addressed that possibility by providing that a taxpayer generally cannot receive more than one

accuracy-related penalty for the same underpayment. See
§6662(b) (2006 ed. and Supp. V).[5]

## C

In the alternative, Woods argues that any underpay-
ment of tax in this case would be "attributable," not to
the misstatements of outside basis, but rather to the deter-
mination that the partnerships were shams—which he
describes as an "independent legal ground." Brief for
Respondent 46. That is the rationale that the Fifth
and Ninth Circuits have adopted for refusing to apply
the valuation-misstatement penalty in cases like this,
although both courts have voiced doubts about it. See
*Bemont*, 679 F. 3d, at 347–348; *id.,* at 351–355 (Prado, J.,
concurring); *Keller* v. *Commissioner*, 556 F. 3d 1056, 1060–
1061 (CA9 2009).

We reject the argument's premise: The economic-
substance determination and the basis misstatement are
not "independent" of one another. This is not a case where
a valuation misstatement is a mere side effect of a sham
transaction. Rather, the overstatement of outside basis
was the linchpin of the COBRA tax shelter and the mech-
anism by which Woods and McCombs sought to reduce
their taxable income. As Judge Prado observed, in this
type of tax shelter, "the basis misstatement and the trans-
action's lack of economic substance are inextricably inter-
twined," so "attributing the tax underpayment only to the
artificiality of the transaction and not to the basis over-

---

[5] We do not consider Woods' arguments based on legislative history.
Whether or not legislative history is ever relevant, it need not be
consulted when, as here, the statutory text is unambiguous. *Mohamad*
v. *Palestinian Authority*, 566 U. S. ___, ___ (2012) (slip op., at 8). Nor
do we evaluate the claim that application of the penalty to legal rather
than factual misrepresentations is a recent innovation. An agency's
failure to assert a power, even if prolonged, cannot alter the plain
meaning of a statute.

valuation is making a false distinction." *Bemont*, *supra*, at 354 (concurring opinion). In short, the partners underpaid their taxes because they overstated their outside basis, and they overstated their outside basis because the partnerships were shams. We therefore have no difficulty concluding that any underpayment resulting from the COBRA tax shelter is attributable to the partners' misrepresentation of outside basis (a valuation misstatement).

Woods contends, however, that a document known as the "Blue Book" compels a different result. See General Explanation of the Economic Recovery Tax Act of 1981 (Pub. L. 97–34), 97 Cong., 1st Sess., 333, and n. 2 (Jt. Comm. Print 1980). Blue Books are prepared by the staff of the Joint Committee on Taxation as commentaries on recently passed tax laws. They are "written after passage of the legislation and therefore d[o] not inform the decisions of the members of Congress who vot[e] in favor of the [law]." *Flood* v. *United States*, 33 F. 3d 1174, 1178 (CA9 1994). We have held that such "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz* v. *Wyeth LLC*, 562 U. S. ___, ___ (2011) (slip op., at 17–18); accord, *Federal Nat. Mortgage Assn.* v. *United States*, 379 F. 3d 1303, 1309 (CA Fed. 2004) (dismissing Blue Book as "a post-enactment explanation"). While we have relied on similar documents in the past, see *FPC* v. *Memphis Light, Gas & Water Div.*, 411 U. S. 458, 471–472 (1973), our more recent precedents disapprove of that practice. Of course the Blue Book, like a law review article, may be relevant to the extent it is persuasive. But the passage at issue here does not persuade. It concerns a situation quite different from the one we confront: two separate, nonoverlapping underpayments, only one of which is attributable to a valuation misstatement.

Opinion of the Court

\*    \*    \*

The District Court had jurisdiction in this partnership-level proceeding to determine the applicability of the valuation-misstatement penalty, and the penalty is applicable to tax underpayments resulting from the partners' participation in the COBRA tax shelter.  The judgment of the Court of Appeals is reversed.

*It is so ordered.*