**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CANDYCE MARTIN 1999 IRREVOCABLE TRUST, a Partner other than the Tax Matters Partner; CONSTANCE GOODYEAR 1997 IRREVOCABLE TRUST, a Partner other than the Tax Matters Partner, <br><br>       *Petitioners-Appellants*, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br>      *Respondent-Appellee.* | No. 11-17879 <br><br> D.C. Nos. <br> 4:08-cv-05150-PJH <br> 4:08-cv-05151-PJH <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 16, 2013—San Francisco, California

Filed January 13, 2014

Before: Sidney R. Thomas and M. Margaret McKeown,
Circuit Judges, and Mark W. Bennett, District Judge.[*]

Opinion by Judge Thomas

---

[*] The Honorable Mark W. Bennett, District Judge for the U.S. District Court for the Northern District of Iowa, sitting by designation.

## SUMMARY**

### Tax

The panel affirmed in part and reversed in part the district court's denial of a petition for readjustment of partnership items, brought by a group of heirs of the founders of Chronicle Publishing Company in connection with its sale and resulting tax consequences.

The heirs owned a portion of the company, either outright or through family trusts. They formed a tiered partnership structure and commenced a series of transactions designed to minimize their tax liability from the company's sale. In connection with an IRS audit of tax returns for two partnerships involved in the transactions, the IRS executed agreements extending the limitations period for assessing taxes. The IRS then issued a Notice of Final Partnership Administrative Adjustment (FPAA) that effectively increased the heirs' tax liability. The heirs, via two trusts that were partners in the partnerships, challenged the FPAA as time-barred.

After reviewing partnership taxation law and the language of the extension agreements, the panel concluded that some of the adjustments made in the FPAA were directly due to, caused by, or generated by partnership items that flow through to the partners (appellants), and that the extension agreements therefore encompassed some of the adjustments

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

made by the FPAA and permitted the IRS to assess new tax on appellants today.

## COUNSEL

Michael J. Desmond (argued), Law Offices of Michael J. Desmond, APC, Santa Barbara, California; Ronald L. Buch, Jr. and Saul Mezei, Bingham McCutchen LLP, Washington, D.C., for Petitioners-Appellants.

Arthur T. Catterall (argued), Attorney, Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Deputy Assistant Attorney General, Gilbert S. Rothenberg, and Jonathan S. Cohen, Attorneys, United States Department of Justice, Tax Division, Washington, D.C.; Melinda L. Haag, United States Attorney, and Tom Moore, Assistant United States Attorney, United States Attorneys' Office for the Northern District of California, San Francisco, California, for Respondent-Appellee.

## OPINION

THOMAS, Circuit Judge:

In this appeal, we examine some of the tax consequences arising from the sale of the Chronicle Publishing Company and, specifically, whether the Internal Revenue Service's proposed adjustment of certain partnership tax items was time barred. Although the ultimate issue is relatively straightforward, both the back story and the legal framework are somewhat complex, requiring us to delve deep in the heart of taxes.

I

The storied Chronicle Publishing Company was founded in the mid-1800s in San Francisco by teenage brothers Charles and M. H. de Young with a borrowed $20 gold piece. Their first venture, the *Daily Dramatic Chronicle*, began with a small circulation, but its readership quickly tripled when it provided the only breaking news accounts of the assassination of Abraham Lincoln. It was rechristened as the *Morning Chronicle* and ultimately the *San Francisco Chronicle*. Within a few decades, it became the largest circulation newspaper on the West Coast.[1]

After the death of Charles de Young in 1880, M. H. de Young assumed control of the paper, incorporated it as the Chronicle Publishing Company ("Chronicle Publishing") in 1906, and ran the enterprise until his death in 1925. He left the newspaper assets in an irrevocable trust that would terminate on the death of all five of his children. From M. H. de Young's death until the early 1990s, a family member remained at the helm of the media empire. Over the course of time, Chronicle Publishing expanded its operations, acquiring a television station along with other properties and forming a book publishing company.

The *Chronicle* was not the only media game in town. Mining entrepreneur George Hearst acquired the rival *San Francisco Examiner* in 1880 and turned its management over to his son William Randolph Hearst seven years later, when the elder Hearst became a United States Senator. Over the next century, the *Examiner* and *Chronicle* engaged in a fierce

---

[1] *See generally* John P. Young, *Journalism in California* 68–71 (1915).

competition for readers.[2]   With both papers experiencing financial challenges in the early 1960s, the *Examiner* and the *Chronicle* entered into a joint operating and profit sharing agreement in 1965.   The joint operating agreement also granted Hearst the right of first refusal if Chronicle Publishing were put up for sale.   *Reilly v. Hearst Corp.*, 107 F.Supp.2d 1192–99 (N.D.Cal. 2000).

When M. H. de Young's last child died in 1988 and the irrevocable trust dissolved, Chronicle Publishing elected to be treated as a Delaware Subchapter S corporation.   Companies generally take such actions to avoid the double taxation attendant to "C" corporations, where taxes are assessed on both corporations and shareholders.   The Subchapter S corporate structure is often employed by small, family-held businesses.   However, to discourage misuse of the Subchapter S vehicle, Congress provided that Subchapter S corporations would be subject to the normal double taxation if the corporation were sold within ten years of its creation.   *Estate of Litchfield v. Comm'r*, 97 T.C.M. (CCH) 1079, at *2 (T.C. 2009) (citing 26 U.S.C. § 1374).

In the late 1990s, amidst deteriorating family relationships and financial challenges, and after the ten-year Subchapter S waiting period expired, the de Young heirs decided to sell most of the assets of Chronicle Publishing to the rival Hearst Corporation and distribute the assets among the heirs according to their ownership percentages.   The *Chronicle* was to continue as a morning paper, and the *Examiner* was sold to a third party.

---

[2] *See generally* David Nasaw, *The Chief: The Life of William Randolph Hearst* 59–80 (2006).

In its discussions of the sale, Chronicle Publishing's Board of Directors realized the possibility of future liability arising from a variety of potential issues, such as environmental problems, contractual disputes, and the risk that Chronicle Publishing might lose its Subchapter S status. Thus, the Directors prepared a recontribution agreement, which provided that the shareholders would contribute on a pro rata basis if there were future Chronicle Publishing liabilities. Each shareholder was required to execute the recontribution agreement as a condition of receiving a distribution of proceeds from the Chronicle Publishing sale.

Our case involves one group of de Young heirs, specifically Conseulo Martin (M. H. de Young's granddaughter) and her five children ("the Martin heirs"). The Martin heirs owned 16.67% of the shares of Chronicle Publishing, either outright or through fourteen family trusts ("the Martin Family Trusts" or "trusts"). Some of the trusts had existed since the 1980s; others were created just before the Chronicle Publishing sale.

The Martin heirs sought advice on how to minimize the tax consequences of the proposed Chronicle Publishing sale and to protect themselves against future liabilities posed by the recontribution agreement. After consulting with several tax specialists, the Martin heirs decided to implement what the IRS now claims was a "Son of BOSS" tax shelter.[3] Although there are a number of variants, a "Son of BOSS" tax scheme generally involves a "series of contrived steps in a partnership interest to generate artificial tax losses designed

---

[3] "BOSS" is an acronym for "Bond and Option Sales Strategy." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 446 n. 2 (5th Cir. 2008). "Son of BOSS" is a variation of the "BOSS" tax shelter. *Id.*

to offset income from other transactions." *Nevada Partners Fund, L.L.C. ex rel. Sapphire II, Inc. v. U.S. ex rel. I.R.S.*, 720 F.3d 594, 604 (5th Cir. 2013). Assets encumbered by artificial liabilities are transferred into a partnership with the goal of increasing basis in the partnership. The net result is that the artificial loss offsets the taxable gain.

Thus, acting on tax advice, the Martin Family Trusts formed a tiered partnership structure, meaning that the trusts served as partners of an upper tier of partnerships that owned interests in a lower tier partnership, and then engaged in a short term hedging strategy using option contracts. There were three parts to the structure: (a) the fourteen Martin Family Trusts; (b) an upper partnership tier, which included multiple partnerships; and (c) a single, lower tier partnership. At the top of the structure were the fourteen Martin Family Trusts, which were the ultimate partners of the two tiers of partnerships below.

The upper partnership tier consisted of three partnerships, the most relevant of which is First Ship, LLC ("First Ship"). The fourteen Martin Family Trusts were the First Ship partners and 100% owners. After the Chronicle Publishing sale, the trusts contributed certain of the sale assets to First Ship. The other two upper-tier partnerships (the "minority partnerships"), were Fourth Ship, LLC ("Fourth Ship") and LMGA Holdings, Inc. ("LMGA").

The lower tier consisted solely of First Ship 2000-A, LLC ("2000-A"). First Ship, Fourth Ship, and LMGA were the three partners of 2000-A. First Ship owned 77.03% of 2000-A, with Fourth Ship and LMGA owning minority partnership shares.

With the structure in place, the Martin heirs commenced a series of transactions designed to create losses that would offset the taxable gain realized from the Chronicle Publishing sale.  The trusts purchased certain assets, in addition to the stock they already owned, and transferred some assets to the partnerships.  Most relevant to this case, the trusts purchased $315.7 million in European-style option contracts ("the long options"), while simultaneously selling $314.8 million in similar-style option contracts ("the short options").  The trusts paid JP Morgan the difference between the two sets of options, roughly $900,000.  The trusts then contributed their assets to the upper-tier partnerships, mostly to First Ship. First Ship received over $485 million in assets from the trusts, including the value of the purchased long options.  In contrast, Fourth Ship only received $29.4 million in assets. First Ship then contributed $415 million in assets to 2000-A, including the value of the purchased long options.  Fourth Ship and LMGA also transferred some of their more limited assets to 2000-A.

Throughout the transactions, the various entities did not treat the short options as a liability or subtract the amount owed on the short options from the amount purchased in long options.  As a result, the Martin Family Trusts and First Ship each saw a dramatic increase in their tax bases in the partnerships below them (i.e., the Martin Family Trusts in relation to First Ship and First Ship in relation to 2000-A). Following the contribution, 2000-A sold off its assets, terminated the options, distributed its remaining holdings back to its partners, primarily First Ship, and dissolved.

2000-A filed its Form 1065 partnership tax return on March 22, 2001.  First Ship in turn reported its share of gains and losses from the closing out of 2000-A, including a $321

million short-term capital loss, in a March 22, 2001 Form 1065 return. Fourth Ship and LMGA also filed returns and posted small losses due to the liquidation of 2000-A. First Ship's partners, the Martin Family Trusts, timely filed their own returns before April 15, 2001. Due to the inflated basis the Martin Family Trusts had in First Ship, the trusts reported losses of over $320 million following the termination of the options and the dissolution of 2000-A.

The net result of these transactions was that the Martin heirs did not owe any taxes on the proceeds from the Chronicle Publishing sale. Perhaps not unexpectedly, this fortuity drew the attention of the IRS. In 2004, the IRS began an audit of the year 2000 tax returns for First Ship and 2000-A and First Ship's 2001 tax return.

Both 2000-A and First Ship are subject to the uniform audit rules of the Tax Equity and Fiscal Responsibility Act ("TEFRA"). *See* 26 U.S.C. ("I.R.C.") §§ 6221–6233. Because the three-year statute of limitations found in I.R.C. § 6229 and § 6501 was near, the IRS executed Form 872-I Extension Agreements ("extension agreements") with the Martin Family Trusts. The following restrictive language was added to each of the agreements:

> The amount of any deficiency assessment is to be limited to that resulting from any adjustment directly or indirectly (through one or more intermediate entities) attributable to partnership flow-through items of First Ship LLC, and/or to any adjustment attributable to costs incurred with respect to any transaction engaged in by First Ship LLC, any penalties and additions to tax attributable to any such

> adjustments, any affected items, and any
> consequential changes to other items based on
> any such adjustments.

Because the first set of agreements only extended the limitations period until April 15, 2005, the IRS further extended the period through successive agreements, eventually extending the period until June 30, 2008.

On June 19, 2008, the IRS issued a Notice of Final Partnership Administrative Adjustment ("FPAA") to 2000-A for the 2000 tax year. It did not issue an FPAA for First Ship for the 2000 tax year. On the same date, the IRS issued an FPAA for First Ship for the 2001 tax year. There is no challenge to the 2001 FPAA to First Ship, so the only FPAA at issue in this case is the FPAA to 2000-A for the 2000 tax year ("2000-A FPAA"). The FPAA disregarded all of 2000-A's transactions, labeling the partnership a sham and finding it "lacked economic substance." Most relevant here, the FPAA declared that the short options constituted liabilities and expressly reduced First Ship's basis in 2000-A by $314,885,516. This had the effect of eliminating most of the $321 million short-term capital loss reported by First Ship on its 2000 tax return.

Two of the trusts, the Candyce Martin 1999 Irrevocable Trust and the Constance Goodyear 1997 Irrevocable Trust ("taxpayers"), challenged the FPAAs by filing petitions against the United States. Taxpayers filed for partial summary judgment, challenging the FPAA to 2000-A. Taxpayers argued the 2000-A FPAA was time-barred by the restrictive language in the extension agreements. The district court denied taxpayers' partial summary judgment motion. The court held that "the extension agreements encompass the

adjustments made by the IRS in the FPAA issued to 2000-A." Relying on the "direct connection" between 2000-A and First Ship, the court found "the FPAA issued to 2000-A involve[d] an adjustment directly attributable to flow-through items of First Ship." The court analogized to *Brody v. Comm'r*, 55 T.C.M. (CCH) 808 (1988), in which the tax court held that an extension agreement covering a lower-tiered partnership encompassed a notice of deficiency to the partners and the upper-tiered partnership.

After a bench trial, the district court issued an order denying taxpayers' petition for relief. Following the district court's entry of final judgment, taxpayers filed a timely notice of appeal.

We have jurisdiction under 28 U.S.C. § 1291. We "review de novo a district court's grant or denial of a motion for partial summary judgment." *Balvage v. Ryderwood Improvement and Serv. Ass'n, Inc.*, 642 F.3d 765, 775 (9th Cir. 2011). "Interpretation of [IRS] waiver agreements is subject to the rules governing interpretation of contracts; and when, as in this case, the lower court based its decision on the language of the agreement and principles of contract interpretation, the decision is one of law which we review de novo." *Roszkos v. Comm'r*, 850 F.2d 514, 516 (9th Cir. 1988) (internal citations omitted).

## II

Before we analyze the legal effect of the FPAA and extension agreements in this case, some additional background on the structure of partnership taxation law is required. Unlike corporations, partnerships are not subject to federal income tax. I.R.C. § 701. However, partnerships do

file informational tax returns, *id.* § 6031, which inform the partners of their distributive share of partnership gains, losses, deductions, or credits. *See id.* §§ 701, 702. To avoid the redundancy of assessing the effect of a partnership on a partner's tax returns at the individual partner level, Congress enacted TEFRA, "which created a single unified procedure for determining the tax treatment of all partnership items at the partnership level." *Randell v. United States*, 64 F.3d 101, 103 (2d Cir. 1995); *see also United States v. Woods*, 134 S. Ct. 557, 562–63 (2013). Partnership items, such as a partnership's income, gain, loss, deductions, or credits, 26 C.F.R. § 301.6231(a)(3)–1(a)(1)(i), are items that must be taken into account on a partner's federal income tax return and that are determined by the Treasury Secretary to be "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3).

Under TEFRA, when the IRS initiates adjustment "proceedings at the partnership level," it must notify certain partners. *Woods*, 134 S. Ct. at 563. The IRS sends notice of an adjustment in the form of an FPAA. *Id.* A partnership can challenge an FPAA under I.R.C. § 6226. *Id.* After an FPAA becomes final, "the IRS may assess partners with their distributive share of the adjusted partnership items." *Randell*, 64 F.3d at 104.

Generally, the IRS must assess federal income tax within three years of a taxpayer filing his return. I.R.C. § 6501(a). For assessments related to partnerships, TEFRA has established a separate provision for extending the Section 6501 statute of limitations for assessments attributable to partnership items. *Id.* § 6229; *see also Bakersfield Energy Partners, LP v. Comm'r*, 568 F.3d 767, 770 n.5 (9th Cir. 2009) (noting that Section 6229 "provides a minimum time

period in which the IRS can assess a tax deficiency"). With regard to partnerships, Section 6229 states that:

> [T]he period for assessing any tax imposed by [the federal income tax subtitle of the Internal Revenue Code] with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of–
>
> > (1) the date on which the partnership return for such taxable year was filed, or
> >
> > (2) the last day for filing such return for such year (determined without regard to extensions).

I.R.C. § 6229(a). The provision allows for an extension of this three-year period, however, in two instances relevant to this case:

> (1) if an FPAA is filed before the expiration of either the limitations period itself or an extension of the limitations period. *Id.* § 6229(d).
>
> (2) if the IRS negotiates an agreement to extend the period with any or multiple ultimate partners or, with respect to all partners, with the tax matters partner. *Id.* § 6229(b)(1).

An extension agreement may include restrictive language or a "restricted consent" to limit its scope.   *See* I.R.M. 25.6.22.8.1 (Jan. 1, 2000).

Extension agreements, including those with restricted consent language, have long been viewed as "unilateral waiver[s]" of the assessments limitations period and not as contracts or tolling agreements. *Stange v. United States*, 282 U.S. 270, 276 (1931).   Nevertheless, extension agreements are interpreted using contract principles. *Roszkos*, 850 F.2d at 516.

The limitations period and extension options in Section 6229 apply to *assessments of tax* against the tax-paying partner(s).  An FPAA, on the other hand, need not be issued within a certain limitations period. *Meruelo v. Comm'r*, 691 F.3d 1108, 1117–18 (9th Cir. 2012).  However, while the FPAA may be issued at any time, it is "subject only to the practical limitation that the FPAA may affect only those partners whose individual returns remain open under" an extension pursuant to I.R.C. Sections 6501 or 6229.  *Id.* (internal quotation marks omitted).

III

With this factual and legal background in hand, we can now set aside the MacGuffins and examine the primary issue before us: the scope and effect of the extension agreements. We conclude that the extension agreements between the Martin Family Trusts and the IRS encompass some of the adjustments made to 2000-A by the IRS's 2000-A FPAA.

The restrictive language in the extension agreements reads, in pertinent part, that "[t]he amount of any deficiency

assessment is to be limited to that resulting from any adjustment directly . . . attributable to partnership flow-through items of First Ship."   Although the government argues the term "adjustment" in these agreements refers to adjustments to the taxes of the Martin Family Trusts, we conclude that under the TEFRA regime, the term "adjustment" in agreements such as these refers to partnership-level adjustments conducted through an FPAA. *Cf. Randell*, 64 F.3d at 104.   The term "deficiency assessment" refers to changes to a partner's tax liability. *See, e.g.*, I.R.C. § 6225.   The term "partnership flow-through items," then, logically means partnership items that flow through to the partnership's ultimate partners.   The most obvious partnership flow-through items are items of income or loss because those items ultimately flow through successive partnership tiers and are reported on the tax returns of the partnership's partners. *See, e.g.*, *Tigers Eye Trading, LLC v. Comm'r*, 138 T.C. 67, 88 (2012) ("A partnership['s] . . . items of income and loss flow through to its partners.").   In contrast, for example, a partnership's distributions or contributions are partnership items, 26 C.F.R. § 301.6231(a)(3)–1(a)(4), that do not flow through to the partners.

The term "attributable to" is used throughout the Internal Revenue Code but is not defined in statute and "has no special technical meaning under the tax laws." *Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1330 (Fed. Cir. 2007).  Both the court in *Electrolux* and the United States Court of Federal Claims have defined "attributable to," as it appears in statute, to mean "'due to, caused by, or generated by.'" *Russian Recovery Fund Ltd. v. United States*, 101 Fed. Cl. 498, 507–09 (2011) (quoting *Electrolux Holdings, Inc.*, 491 F.3d at 1331) (interpreting "attributable to" as it is used

in I.R.C. § 6229 and rejecting the argument that this straightforward definition of "attributable to" "runs afoul of the Federal Circuit's admonition against a 'but for' test"). Here, because the extension agreements are governed by Section 6229, we interpret the term "attributable to" as used in these extension agreements to mean "due to, caused by, or generated by." *See id.*

Therefore, the question in this appeal is whether at least some of the adjustments made in the 2000-A FPAA are directly due to, caused by, or generated by partnership items of First Ship that flow through (e.g., that are items of income or loss) to First Ship's partners, the Martin Family Trusts. If so, the extension agreements encompass at least part of the 2000-A FPAA and, when combined with the subsequent extension of time triggered by the issuance of the FPAA itself, allow for the IRS to assess new tax on the Martin Family Trusts today.

Reduced to this simple question, the language of the agreements leads us to affirm the district court in part. Some of the partnership items of First Ship that flow through to the Martin Family Trusts triggered some of the adjustments in the 2000-A FPAA. Specifically, in its 2000 tax return, First Ship claimed $318,018,377 in losses due to the liquidation of 2000-A. This loss is not merely First Ship's share of the losses claimed by 2000-A. Those losses, rather minor, only add up to $4,067,455. Instead, this $318 million loss originated with First Ship, due to its artificially high basis in 2000-A. This loss was a partnership flow-through item of First Ship that led to the adjustment to 2000-A. Indeed, without this large loss, which was the main target of the IRS audit and investigation, there would have been no 2000-A FPAA.

Following its investigation, the IRS could have issued an FPAA to First Ship, disallowing the loss, or it could have issued an FPAA to 2000-A, barring any recognition of that entity and declaring that the short options constituted liabilities.  Here, the IRS chose the latter and that action was not outside the strictures of the extension agreements. Contrary to taxpayers' arguments, the agreements are not so restrictive as to hold that an adjustment that is directly attributable to a partnership flow-through item of First Ship will not be allowed if it is technically an adjustment to a partnership item of a lower-tier, but related, partnership.  This is especially true given that the limitations period established in Sections 6229 and 6501 applies to assessments of tax, not adjustments.  *Meruelo*, 691 F.3d at 1117–18.  Here, the operative restraint on assessments, and therefore, practically, on the adjustments, is the extension agreements.  And because some of the adjustments in the FPAA (i.e., those portions of the FPAA that had the effect of voiding the $318 million loss) were directly attributable to the $318 million loss claimed by First Ship, a First Ship partnership flow-through item, the extension agreements encompass those adjustments.[4]

Taxpayers dispute this conclusion, relying heavily on *Russian Recovery Fund*.  In that case, the Court of Federal Claims held that an agreement that specifically cites an upper-tier partnership does not encompass adjustments made to the lower-tiered partnership.  *Russian Recovery Fund Ltd.*, 101 Fed. Cl. at 509–10.  But *Russian Recovery Fund* is distinguishable from our case.  Unlike *Russian Recovery*

---

[4] By operation of I.R.C. § 6229(d), the issuance of the FPAA suspended any open period for tax assessment, but only as to tax attributable to any partnership item of 2000-A as to its 2000 tax year.

*Fund*, where the upper-tier partnership simply reported and passed along its share of the lower-tiered partnerships's losses, *id.* at 510, here the upper-tiered partnership, First Ship, was largely reporting its own loss. This loss generated both the massive loss claimed by the Martin Family Trusts and the adjustments made by the IRS to 2000-A, bringing it within the confines of the extension agreements. Indeed, this loss did not and could not have originated with 2000-A, since it was only the *dissolution* of 2000-A that gave rise to the loss. *Id.* Thus, unlike in the partnership structure in *Russian Recovery Fund*, the IRS's adjustments eliminating the $318 million First Ship loss, regardless of whether they were made through an adjustment to First Ship or 2000-A, were caused by the $318 million loss that originated with First Ship.[5]

## IV

We conclude that the extension agreements encompass the adjustments made in the 2000-A FPAA that are directly attributable to partnership flow-through items of First Ship. Thus, as both parties agree, they do not encompass adjustments to items of 2000-A which only flow up through the minority partners and as a result have no connection to First Ship. Nor do they apply to any adjustments made in the 2000-A FPAA to partnership items of 2000-A of which First

---

[5] Taxpayers also argue that the district court misinterpreted and misapplied *Brody*. However, the court's reliance on *Brody* is not essential to its decision, or our decision, in this case. While taxpayers are correct that *Brody* was decided before TEFRA and is different than this case, the district court acknowledged these distinctions and simply used *Brody* to underscore the significance of the relationship between partnerships in a multi-tiered partnership structure (e.g., the fact that liabilities claimed by 2000-A ultimately reach the Martin Family Trusts by first passing through First Ship).

Ship merely claimed a share (e.g., the $4,067,455 share First Ship claimed of 2000-A's reported losses).  Those losses originated with 2000-A and, therefore, adjustments to 2000-A that affect those losses are not directly attributable to partnership flow-through items of First Ship.  To the extent that the district court concluded otherwise, it erred.

V

In sum, we affirm in part and reverse in part.  We agree with the district court that the extension agreements between the IRS and First Ship encompass adjustments made in the 2000-A FPAA that are directly attributable to partnership flow-through items of First Ship.  These are adjustments to 2000-A that stem from partnership flow-through items of First Ship that *originate* with First Ship (i.e., adjustments that eliminate the $318 million loss claimed by First Ship due to its inflated basis in 2000-A).  We also hold that the FPAA to 2000-A extended the limitations period for assessing tax beyond the extension agreements and through the present litigation.  However, the agreements do not extend to adjustments in the 2000-A FPAA that are not directly attributable to First Ship.  Because the district court held more broadly that "the extension agreements encompass the adjustments made by the IRS in the FPAA issued to 2000-A," we remand to the district court to make a determination of which adjustments in the 2000-A FPAA are directly attributable to partnership flow-through items of First Ship, consistent with this opinion.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART**