In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00159-CV**
_____

**TPC GROUP LITIGATION**

====================================================

**On Appeal from the 128th District Court**
**Orange County, Texas**
**Trial Cause No. A2020-0236-MDL**

====================================================

**MEMORANDUM OPINION**

In this multi-district litigation (MDL) arising from explosions at the TPC petrochemical processing plant in Port Neches, Texas, Appellees (collectively referred to as "Plaintiffs")[1] asserted claims against Appellants: First Reserve Management, L.P.; First Reserve Corporation, L.L.C.; FR XII Alpha AIV, L.P.; FR XII-A Alpha AIV, L.P.; FR Sawgrass LP; SK Second Reserve, L.P. f/k/a SK Capital Partners, LP; and SK Sawgrass, L.P. (collectively referred to as "the Investors").

---

[1]Appellees/Plaintiffs comprise residents of Southeast Texas with cases pending in Cause No. A2020-0236-MDL, *In re: TPC Group Litigation*, in the 128th Judicial District Court of Orange County, Texas ("MDL court").

The Investors are non-resident entities, including, among others, a private equity investment firm, private equity funds, holding companies, and some Investors that have indirect ownership interests in the TPC Group ("TPC").[2] The Investors include two groups that filed separate appellate briefs, which challenge the MDL court's denial of their special appearances and contest whether the MDL court may exercise general or specific jurisdiction over the Plaintiffs' suit. The first group includes: First Reserve Management, L.P.; First Reserve Corporation, L.L.C.; FR XII Alpha AIV, L.P.; FR XII-A Alpha AIV, L.P.; and FR Sawgrass LP (collectively referred to as "the First Reserve Defendants"). The second group includes: SK Second Reserve, L.P. f/k/a SK Capital Partners, LP and SK Sawgrass, L.P. (collectively referred to as "the SK Defendants"). The record contains the following organizational charts, which depict the Investors' structure and how the corporate ownership interests in them indirectly connect them to TPC.

---

[2]Plaintiffs sued TPC Group Inc. and TPC Group LLC, alleging the LLC is the TPC entity that operates the TPC plant. The difference between the two entities is not relevant to this appeal. *See In re First Reserve Mgmt., L.P.*, 671 S.W.3d 653, 657 n.4 (Tex. 2023) (orig. proceeding).



TPC, Sawgrass, First Reserve Affiliate, and SK Second Reserve/SK Sawgrass Defendants

1529



The record shows TPC is indirectly owned by Sawgrass Holdings LP ("Sawgrass Holdings"), which is owned by FR Sawgrass, LP ("FR Sawgrass"), which is owned by two of the First Reserve Defendants, FR XII Alpha AIV, L.P. and FR XII-A Alpha AIV, L.P. (collectively referred to as "the Alpha entities"). First Reserve Management, L.P. and First Reserve Corporation, L.L.C. (we refer to First Reserve Management and First Reserve Corporation collectively as "First Reserve") invested money in the Alpha entities, which are separate entities and are entities in which First Reserve owns no interest. The Alpha entities are limited partners in FR

4

Sawgrass, which is a limited partner with one of the SK Defendants, SK Sawgrass, LP ("SK Sawgrass"), which is the limited partnership in Sawgrass Holdings. Sawgrass Holdings' general partner is the GP Board, comprised of a five-member Board of Managers. The First Reserve Defendants and the SK Defendants each appoint two members to the GP Board, and the fifth member is TPC's Chief Executive Officer.[3] The parties concede that the GP Board operates as TPC's Board.

Plaintiffs seek to hold the Investors directly liable for TPC's torts, and they alleged the Investors exercised abnormal control over TPC's operations through the GP Board, thus the MDL court has personal jurisdiction under the specific jurisdiction test. In this interlocutory appeal, the Investors challenge the MDL court's orders denying their special appearances. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (authorizing interlocutory appeal).[4] They maintain that Texas

---

[3]Sawgrass Holdings LP and Sawgrass Holdings GP LLC are not parties in this appeal.

[4]In a previous mandamus proceeding, the Texas Supreme Court denied a petition for mandamus filed by First Reserve Management, L.P.; First Reserve Corporation, L.L.C.; FR XII Alpha AIV, L.P.; FR XII-A Alpha AIV, L.P.; FR Sawgrass, L.P.; and Sawgrass Holdings, L.P. (collectively "First Reserve") and failed to direct the MDL court to take action despite holding that the MDL court should have granted First Reserve's Motion to Dismiss. *See In re First Reserve Mgmt., L.P.*, 671 S.W.3d at 658 & n.9, 662–64 (denying mandamus relief and holding that Plaintiffs' negligent undertaking claim had no basis in law or fact and that the MDL court should have granted First Reserve's motion to dismiss); *see also In re First Reserve Mgmt., L.P.*, 665 S.W.3d 44, 46 (Tex. App.—Beaumont 2022, orig. proceeding) (denying mandamus relief and concluding that Plaintiffs' petition provided First Reserve with fair notice of the legal and factual basis of Plaintiffs' claims). The Texas Supreme Court held that First Reserve's ownership interest in

5

courts do not have general or specific personal jurisdiction over them because the jurisdictional evidence rebuts Plaintiffs' allegations that the Investors exercised direct operational control over TPC through the GP Board. For the reasons explained below, we reverse the MDL court's orders denying the Investors' special appearances and render the judgment the MDL court should have rendered, dismissing Plaintiffs' claims against the Investors for lack of personal jurisdiction. *See* Tex. R. App. P. 43.2(c).

## PERTINENT BACKGROUND

In November 2019, TPC's facility in Port Neches, Texas ("the Port Neches facility") exploded, which the Plaintiffs allege resulted in extensive personal injury, property damage, chemical releases, and other damages. Plaintiffs sued TPC and its plant manager for damages from the explosion. Plaintiffs' Fifth Amended Master Consolidated Petition, their live pleadings, alleges claims against the Investors on

---

TPC, appointment of directors to TPC's board, and any other actions consistent with investor status were insufficient to make it liable for TPC's conduct and that Plaintiffs failed to plead facts sufficient to show that First Reserve undertook in other ways to run TPC's day-to-day operations. *See In re First Reserve Mgmt., L.P.*, 671 S.W.3d at 662–63. The Texas Supreme Court concluded that Plaintiffs failed to sufficiently plead "*factual allegations* to show a cause of action with a basis in law" that First Reserve was directly liable for the damages. *See id.* at 663 (emphasis original).

theories of negligence, trespass, nuisance, negligent misrepresentation, fraud, veil piercing, disregard of corporate identities, and failure to warn.

Plaintiffs alleged that the Investors are subject to personal jurisdiction under the specific jurisdiction test because they purposely availed themselves of the protection of Texas laws by doing business in Texas and have the requisite minimum contacts with Texas, and because their claims relate to the Investors' business activities within Texas so they could reasonably anticipate being haled into a Texas court. Plaintiffs alleged that the Investors purposely availed themselves of Texas's jurisdiction "by their ownership and decision-making control and/or managerial authority and/or assumption and/or usurpation of safety and management duties including turnaround[5] governance of TPC management duties." Plaintiffs alleged that the Investors and TPC are "fused for jurisdictional purposes" due to the Investors' "control over the internal business operations and affairs [of] TPC beyond their role as investors." Plaintiffs pleaded that the Investors exercised control over TPC through the GP Board, which includes two members from the First Reserve Defendants and two members from the SK Defendants. Plaintiffs pleaded that the Investors, "through their financial, interest, ownership, and control dictate the day-

---

[5]A turnaround is a scheduled event where the entire process unit of an industrial plant is taken offline for an extended period for revamp and renewal. *Id.* at 657 n.5. A turnaround is expensive in both terms of direct costs and because it results in lost production. *Id.*

7

to-day operations and maintain complete governance over TPC and its business affairs[.]"

Plaintiffs also alleged the Investors improperly dictated corporate spending and "whether TPC may, as necessary, spend monies on necessary turnarounds, which here would have altogether avoided the reasonably foreseeable explosions resulting from a never ameliorated infection of popcorn polymerization at TPC . . . ." Plaintiffs pleaded that the Investors, "by assuming turnaround governance, undertook direct operational control and governing authority over whether or not necessary safety repairs were or were not made" at TPC by "exercising turnaround expense approval[.]" Plaintiffs alleged the Investors denied and/or delayed requests for necessary capital improvements and denied funds to adequately supply spare parts and perform necessary maintenance. Plaintiffs alleged that through the GP Board, the Investors controlled the timing of the turnaround necessary to prevent the explosions and chose to repeatedly delay the turnaround required to address the popcorn polymerization issues. Plaintiffs pleaded that the Investors are TPC's ultimate parent and "control, manage, operate," and treat TPC as "their personal bank accounts" so that TPC is the Investors' alter ego, and "the lines between parent and subsidiary are substantially blurred" making it impossible to determine where the Investors end and TPC begins. Plaintiffs alleged that there is such unity between

TPC and the Investors, through their control of the GP Board, that their separateness ceased to exist.

**First Reserve Defendants' Special Appearance**

The First Reserve Defendants filed a Special Appearance challenging the MDL Court's personal jurisdiction over them. They first challenged the MDL court's general jurisdiction over them. The First Reserve Defendants explained that First Reserve Management, L.P. ("First Reserve Management") is an exempted limited partnership organized under the laws of the Cayman Islands with its principal place of business in Stamford, Connecticut, and the First Reserve Corporation, L.L.C. ("First Reserve Corporation") is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. The First Reserve Defendants explained that the Alpha entities are exempted limited liability partnerships organized under the laws of the Cayman Islands with their principal place of business in Stamford, Connecticut, and that FR Sawgrass is a Delaware limited partnership with its principal place of business in Stamford, Connecticut. The First Reserve Defendants argued that Plaintiffs failed to show the MDL court has general jurisdiction over them because they are neither incorporated in Texas nor maintain their principal places of business in Texas.

The First Reserve Defendants argued that Plaintiffs failed to plead any jurisdictional facts showing personal jurisdiction over them is proper in this forum.

The First Reserve Defendants contended that rather than establishing personal jurisdiction as to each defendant, Plaintiffs lumped all defendants together and in conclusory pleadings alleged that the "'causes of action asserted arose from, or are substantially connected with, purposeful acts committed by Defendants in Texas because [they] executed their contracts, and . . . conducted business within, the State of Texas.'" The First Reserve Defendants argued that Plaintiffs made conclusory allegations that defendants intentionally availed themselves of the protection of Texas laws by doing business and having minimum contacts with Texas, and that the claims made the basis of this lawsuit arose from defendants' business activities, which included owning and operating plants and industrial services businesses in Texas.

The First Reserve Defendants next challenged Plaintiffs' alter ego theory of jurisdiction. The First Reserve Defendants maintained that the declaration attached to their special appearance showed they are separate and distinct entities from TPC and did not operate or maintain the Port Neches facility. The First Reserve Defendants explained that First Reserve Management is a private equity investment firm that sponsors private equity funds and provides investment advice, and the First Reserve Corporation is a limited liability company managed by First Reserve Management. The First Reserve Defendants asserted that First Reserve has no ownership in TPC, and the Alpha entities and FR Sawgrass have only indirect

10

limited partnership ownership interests in TPC. The First Reserve Defendants also stated that while the Alpha entities made capital contributions to TPC through FR Sawgrass, a passive holding company, the Alpha entities and FR Sawgrass do not pay any of TPC's operational expenses.

The First Reserve Defendants maintained that they are distinct, separate entities without operational control over TPC, no managerial oversight over TPC's operations, and did not run its day-to-day operations. The First Reserve Defendants argued that Plaintiffs failed to show they had sufficient contacts with Texas, and the fact that First Reserve has an office in Texas does not make it "at home" in Texas. The First Reserve Defendants also argued that Plaintiffs failed to establish TPC is any First Reserve Defendant's alter ego since they asserted no facts showing that they controlled TPC's internal business operations and affairs so much that any of them should be "fused together" with TPC for jurisdictional purposes. The First Reserve Defendants asserted that TPC Senior Vice President of Operations, Courtney Ruth's testimony established: (1) TPC exclusively managed its Port Neches facility; (2) TPC's officers and employees managed TPC's day-to-day business operations or affairs; and (3) TPC had operational control and independence over its facility's day-to-day operations.

Finally, the First Reserve Defendants also argued that Plaintiffs failed to establish specific jurisdiction because they did not show a substantial connection

11

between their alleged contacts with Texas and the incident. The First Reserve Defendants explained that contacts with the forum state unrelated to the events underlying the lawsuit cannot establish specific jurisdiction. They also contended Plaintiffs' conclusory allegations failed to distinguish between conduct potentially attributable to the First Reserve Defendants versus TPC or the other defendants. The First Reserve Defendants maintained that the evidence disputes any potential connection between their Texas contacts and Plaintiffs' claims of their operational control of TPC.

To support their request that the MDL court dismiss Plaintiffs' claims against them for lack of personal jurisdiction, the First Reserve Defendants included the Declaration of Neil A. Wizel ("Wizel"), the Managing Director of First Reserve Corporation. Wizel stated he was familiar with the First Reserve Defendants' corporate and business records, and he confirmed none of the First Reserve Defendants are incorporated in Texas or have their principal place of business in Texas. Wizel explained that most of First Reserve Management's senior leadership team, including its President, Chief Executive Officer, Chief Financial Officer, Head of Human Resources, and Chief Compliance Officer and General Counsel, are stationed at its headquarters in Connecticut, and First Reserve Management's financial documents and most of its regulatory filings are made from its Connecticut headquarters. Wizel also stated that before the pandemic, First Reserve

12

Management's board meetings took place in Connecticut but are currently held via teleconference.

In his Declaration, Wizel said that the Alpha entities are private equity funds managed but not owned by First Reserve. According to Wizel, the Alpha entities own FR Sawgrass, a passive holding company, and invested in TPC through FR Sawgrass. Wizel stated that the Alpha entities and FR Sawgrass indirectly hold limited partnership ownership interests in entities that indirectly own TPC, but he said they do not pay any of the operation expenses that TPC incurs in managing its business at the Port Neches facility. Wizel explained that FR Sawgrass is managed by its general partner, a non-party to the litigation, and that the board of directors of FR Sawgrass's general partner entity, the GP Board, consists of the following: two First Reserve representatives, including himself; two SK Defendants representatives; and TPC's CFO. According to Wizel, the GP Board performs certain board-level functions for TPC, but GP's Board is not involved in TPC's operational affairs.

In his Declaration, Wizel also addressed First Reserve and he explained that it is not directly involved in operating TPC. For instance, he stated that First Reserve does not have an ownership interest in TPC. He explained that First Reserve maintains a Houston office, which supports some of their general business operations involving private equity investment in the energy sector, but he said that

13

no TPC employees work at First Reserve's Houston office. Wizel also stated that First Reserve does not pay any expenses TPC incurs in operating its business at its Port Neches facility. Wizel also explained that the Alpha entities made "capital contributions to TPC" in 2012 and 2016 that flowed through other entities.

According to Wizel, the First Reserve Defendants' operations in Texas do not involve managing operations at TPC's Port Neches facility, and the First Reserve Defendants maintain separate and independent internal human resources, payroll, and accounting departments. Wizel stated that TPC has separate offices and headquarters from the First Reserve Defendants and maintains separate financial books, records, and accounts. Wizel said that TPC has different email domains, websites, phone numbers, branding, and trademarks than the First Reserve Defendants. Wizel explained that the First Reserve Defendants did not: provide or train employees to work at the Port Neches facility; run day-to-day operations; provide any managerial oversight of operations; issue any policies, procedures, or other operational or safety documents; hire, train, or mange any TPC employees or contractors; or maintain any of the assets, facilities, or infrastructure. Wizel stated the First Reserve Defendants are not involved in direct operational control or risk mitigation at the Port Neches facility, nor did they control that facility's safety. Wizel asserted that TPC is not any First Reserve Defendant's alter ego, and before the

14

incident, TPC was not inadequately capitalized. Rather, it was an economically viable, independent separate entity from the First Reserve Defendants.

Due to the MDL court's Stipulation and Protective Order governing the case, the First Reserve Defendants filed a less redacted version of their Special Appearance. The First Reserve Defendants included excerpts from the testimony of Ruth, TPC's Senior Vice President of Operations. Ruth testified that in November 2019, TPC controlled the decision-making at the South Unit in Port Neches, and the TPC management senior leadership team controlled the operations of the South Unit. Ruth testified that TPC is the only entity that controlled the South Unit's operations or equipment, and in his experience, the holding companies never made operational decisions for TPC. The First Reserve Defendants argued that Ruth's testimony shows that TPC had exclusive right to manage and control the Port Neches facility.

The First Reserve Defendants also argued that there is no basis for imputing Sawgrass Holdings' contacts with TPC to the First Reserve Defendants based on any testimony that Sawgrass Holdings performs board-level oversight of TPC or that two members of GP's Board were placed there by First Reserve. The First Reserve Defendants explained that Sawgrass Holdings' general partner is the GP Board, and the GP Board's oversight of TPC is consistent with Sawgrass Holdings' investor status, However, that membership on a corporation's board are not contacts that give rise to jurisdiction over the company, even where through its ownership interest it

15

has members on a Texas company's board. The oversight that GP's board exercises over TPC includes receiving monthly operational updates and a financial review plus carrying out quarterly board meetings that involve updates, strategy, and long-range plans. According to the First Reserve Defendants, the GP Board's activities are typical of those of an investor and are therefore irrelevant as factors for purposes of a plaintiff's jurisdictional veil-piercing claim.

The First Reserve Defendants attached excerpts from the deposition of Peggy Macatangay, TPC's Vice President of Technology and Engineering, who testified about Sawgrass Holdings and the GP Board. Macatangay testified that both she and TPC's senior leadership team attend the GP Board's quarterly meetings at TPC's corporate office in Houston. They also attend the GP Board's monthly sponsor reviews, and those meetings include brief operational updates and monthly financial reviews. She explained that capital projects with expenditures exceeding $1 million required the approval of GP Board. Macatangay testified that the GP Board did not approve the annual operating plan for the expenses at the Port Neches facility, and in her position, she did not regularly communicate with the GP Board. Macatangay testified that the GP Board did not deny any requests for capital expenditures at the Port Neches facility for 2019.

## SK Defendants' Special Appearance

The SK Defendants filed a Special Appearance, arguing that Plaintiffs' Petition should be dismissed for lack of personal jurisdiction over them. The SK Defendants explained that they are Delaware limited partnerships with no Texas contacts. The SK Defendants stated that they do not have an office in Texas, there are no "exceptional circumstances" present that would render them "at home" in Texas, and Plaintiffs failed to adequately allege how any of their purported activities are substantially connected to the operative facts of the litigation.

The SK Defendants explained that as a limited partner in Sawgrass Holdings, SK Sawgrass did not possess any authority or control over TPC that warrants imputing TPC's Texas contacts to SK Sawgrass for purposes of general jurisdiction. The SK Defendants also explained that SK Second Reserve, L.P. f/k/a SK Capital Partners, LP (we refer to SK Second Reserve, L.P. f/k/a SK Capital Partners, LP as "SK Second Reserve" and to a second entity called SK Capital Partners, LP, which is a non-party to this appeal, as "SK Capital Partners") holds no partnership interest in Sawgrass Holdings or any other named defendant. The SK Defendants attached the Declaration of Jerome "Jerry" Truzzolino ("Truzzolino") to support their argument that the MDL court lacks personal jurisdiction over them.

In his Declaration, Truzzolino stated that SK Sawgrass is a Delaware limited partnership with no office or employees, and SK Sawgrass has no ownership interest

in or authority over TPC. Truzzolino stated that SK Sawgrass was not involved in the day-to-day operations at the Port Neches facility and did not train or supervise any TPC employees. Truzzolino explained that SK Sawgrass holds a minority limited partnership interest in Sawgrass Holdings, and that SK Sawgrass, Sawgrass Holdings, and TPC are separate and distinct legal entities. Truzzolino also explained that SK Sawgrass was never directly involved in the operations, operational control, or risk mitigation at the Port Neches facility.

The SK Defendants supported their Special Appearance with the Declaration of Carrie Pierce ("Pierce"), in which she explains that she is familiar with SK Second Reserve. In her Declaration, Pierce states that SK Second Reserve is a Delaware limited partnership with no office or employees, and it does not hold a partnership or any other interest in any named defendant. Pierce also stated that SK Second Reserve has no authority over Sawgrass Holdings or TPC, and SK Second Reserve, TPC, and Sawgrass Holdings are separate and distinct legal entities. Pierce said that SK Second Reserve has never been directly involved in operations, operational control, or risk mitigation at the Port Neches facility, the facility which forms the basis of the plaintiffs' claims.

The SK Defendants argued that Plaintiffs failed to meet their initial burden to plead sufficient facts to bring them within the MDL court's jurisdictional reach. The SK Defendants complained that Plaintiffs' allegations that they intentionally availed

themselves of the protection of Texas laws by doing business in Texas and have minimum contacts with Texas are conclusory. The SK Defendants also argued that Plaintiffs did not establish that they are subject to Texas jurisdiction through an "alter ego" or "piercing the corporate veil theory" because Plaintiffs made broad allegations against all the Investors. The SK Defendants explained that there is no veil-piercing analysis to undertake because TPC is not a subsidiary of the SK Defendants.

The SK Defendants also explained that the MDL court lacks specific jurisdiction over them because there is no substantial connection between their alleged activities in Texas and the operative facts of the litigation. The SK Defendants asserted that Plaintiffs' claims relate to the Port Neches facility's management and operational control, but SK Sawgrass did not perform, manage, or direct the day-to-day activities at the Port Neches facility, and SK Second Reserve had no authority over TPC or its operations at the Port Neches facility. The SK Defendants argued the MDL court should dismiss Plaintiffs' claims against them for lack of personal jurisdiction.

**Plaintiffs' Response to Special Appearances**

In "Plaintiffs' Verified Motion to Continue Special Appearance Hearing and Plaintiffs' Preliminary Response to Same[,]" Plaintiffs argued, among other things, that the Investors had availed themselves of Texas jurisdiction. Plaintiffs argued that

19

First Reserve having a lease agreement in Houston and Wizel's residence in Houston shows that the First Reserve Defendants have contacts in Texas that amount to an admission of personal jurisdiction. Plaintiffs maintained that First Reserve Corporation engaged in longstanding business in Texas by performing services and maintaining an office which is enough to establish general personal jurisdiction.

Plaintiffs also argued that Wizel and other employees or representatives of First Reserve attended several meetings of the GP Board's Audit Committee, which included discussions about, among other issues: TPC's long range plan; turnaround governance and costs; safety and environmental topics; financial forecast; technology and engineering overviews; operational excellence; and the explosion at the Port Neches facility. Plaintiffs argued the First Reserve Defendants' participation in "operations" conversations in Houston and their approval of TPC's 2020 Capital and Turnaround Plan showed they controlled TPC's checkbook and day-to-day operations. Plaintiffs argued that First Reserve's participation in physical meetings, office presence, and record of decision making before the explosion is enough to establish specific jurisdiction.

As to the Alpha entities and FR Sawgrass, Plaintiffs explained that FR XII Alpha AIV, L.P. is at the top of the FR Sawgrass pyramid and that more discovery was needed to prove jurisdiction. Plaintiffs also noted FR Sawgrass owns 70.65% of the GP Board and 71.24% of TPC and that there is either a 70.65% or 71.24% chance

that FR Sawgrass's substantial investment in the GP Board and/or TPC confers the MDL court with jurisdiction.

As to the SK Defendants, Plaintiffs argued that SK Sawgrass "owns 27.75587% of Sawgrass Holdings, LP, which owns 100% of TPC Holdings, Inc., which owns TPC." Plaintiffs argued that SK Sawgrass's ownership interest involves some benefit, advantage, or profit from TPC's business activities in Houston and Port Neches. Plaintiffs explained that SK Sawgrass's 27.75587% ownership shows a substantial connection between its business interests and contacts with Texas and points to its corporate control over Sawgrass Holdings, which impacted the Houston and Port Neches operations. Plaintiffs argued that SK Capital Partners participated in, among other meetings, an in-person meeting of the GP Board at TPC's headquarters in Houston, and that meeting concerned TPC's goals, long range planning, turnaround governance, and operational excellence. Plaintiffs maintained that SK Capital Partners' in-person involvement in the Houston meetings is "evident of actions" to secure a benefit, advantage, or profit from the Port Neches facility and shows it deliberately engaged in significant activities and purposely availed itself of Texas jurisdiction. Plaintiffs attached exhibits supporting its jurisdictional allegations.

Plaintiffs filed their Response to the Investors' Special Appearances. Plaintiffs argued First Reserve maintains a substantial Houston office that contains

21

50% of its Managing Directors and is the location where all due diligence, contract negotiations, and investor solicitation for the purchase or investment in TPC occurs. Plaintiffs argued that First Reserve's employees and directors sit on TPC's board and vote to make major financial decisions for TPC. Plaintiffs maintained that First Reserve, its subsidiary, investment funds, and holding company all have significant ties to Texas and are essentially "at home" in Texas.

Plaintiffs argued the Investors purposefully availed themselves and established minimum contacts with Texas by choosing to invest in Texas, reap the benefits of Texas's business friendly laws, and profit off Texas labor by operating a chemical plant. Plaintiffs alleged that First Reserve has significant purposeful ties with Texas, and their claims relate to First Reserve's ties and contacts through First Reserve Management's administration and investment in TPC. Plaintiffs explained First Reserve Corporation's employees sat on the GP Board and made executive-level decisions for TPC with "considerable power in the ultimate decisions regarding maintenance, remodeling, turnaround, and direction of the company[.]"

As for the Alpha entities and FR Sawgrass, Plaintiffs alleged that the Alpha entities have ownership in FR Sawgrass, which has invested in Sawgrass Holdings, a company holding an interest in TPC. Plaintiffs argued that the Alpha entities are "legal fictions incorporated in the Cayman Islands solely for the purpose of investors to buy an interest" in First Reserve Management's investment in TPC. Plaintiffs

22

argued that FR Sawgrass "is not truly a separate entity with employees, holdings, or an office[,]" but a "legal vehicle" for First Reserve Management to hold its interest in TPC. Plaintiffs argued that there is "a direct line of money being transferred down" from First Reserve Management through the Alpha entities and FR Sawgrass into TPC. Plaintiffs maintained that the Alpha entities and FR Sawgrass are extensions of First Reserve Management, which directly controls them. Plaintiffs argued that their claims directly relate to the Investors' investments and decisions, which ultimately led to the actions or omissions that caused the explosions.

As for SK Sawgrass, Plaintiffs argued that SK Sawgrass is a Delaware limited partnership acting as a holding company for a majority interest in Sawgrass Holdings. Plaintiffs argued that it is a vehicle for SK Capital Partners to hold its investment in TPC. Plaintiffs explained SK Sawgrass is operated by SK Capital Partners in New York, and SK Sawgrass's general partner is run by Barry Siadat ("Siadat"), a founder and director of SK Capital Partners and former member of the GP Board. Plaintiffs explained that John "Jack" Norris ("Norris"), a GP Board member, is an SK Capital Partners executive and runs SK Sawgrass. Plaintiffs alleged that Siadat and Norris traveled to Texas to close the TPC investment deal and for their duties as members of the GP Board, which included deciding on maintenance, remodeling, turnarounds, and the direction of TPC's business. Plaintiffs argued SK Sawgrass could not hide its purposeful availment of Texas and

key personnel's visits concerning its investment in TPC and ultimate decision making concerning TPC's operations. Plaintiffs argued that since no Investors met their burden to refute the jurisdictional allegations, their special appearances should be denied.

**The Investors' Reply in Support of Their Special Appearance**

The Investors filed a Reply in Support of Special Appearance, arguing Plaintiffs cannot establish personal jurisdiction over any of them. They argued that the only facts Plaintiffs point to are contacts unrelated to the substance of their claims, and those facts are insufficient to establish general or specific jurisdiction. The Investors maintained that the MDL court should grant their special appearances because Plaintiffs failed to meet their burden.

The Investors explained that Wizel's affidavit disproved Plaintiffs' allegations that the MDL court had general jurisdiction over them since it established their principal places of businesses are in Connecticut and that they are organized under the laws of Delaware or the Cayman Islands. The Investors argued that Plaintiffs failed to meet their burden to establish specific jurisdiction over them because they failed to provide evidence of contacts in Texas which are substantially related to the operative facts underlying their claims. The Investors explained Wizel's testimony that TPC operated and maintained the Port Neches facility and Ruth's testimony that TPC management made all critical operational decisions at the

24

Port Neches facility without orders or guidance from investors or parent entities disproves Plaintiffs' allegations that First Reserve's employees made executive level decisions about the Port Neches facility. The Investors also argued that while Wizel and another First Reserve Managing Director served on the GP Board, their contacts made while acting in a capacity for TPC cannot be attributed to any of the Investors.

As for the Alpha entities and FR Sawgrass, the Investors argued that while Plaintiffs allege that First Reserve Management directs the actions of these entities from its Houston office and reaps the reward of their ownership in TPC, Plaintiffs failed to point to particular facts proving these allegations. The Investors contended that the Alpha entities "have done nothing but buy and hold ownership interests in other entities." The Investors argued that the Alpha entities' indirect capital contributions to TPC in 2012 and 2016, which flowed through FR Sawgrass, are not substantially related to Plaintiffs' claims. The Investors also argued that, besides conclusory assertions, Plaintiffs made no attempt to show that First Reserve Management's alleged control exceeded that normally associated with common ownership and directorship such that disregarding the corporate fiction was warranted to prevent fraud or injustice.

The Investors urged the MDL court to dismiss Plaintiffs' claims against them for lack of personal jurisdiction. To support their arguments, the Investors attached excerpts from Wizel's deposition, where he explained that he and Siadat sat on the

GP Board, which had meetings with TPC's management at TPC's Houston office. Wizel testified that the GP Board functioned as a "typical board[]" and considered "typical board matters." Wizel explained that management discussed topics, including operations and turnarounds, and management offered and recommended decisions considering certain monetary issues even though the GP Board had the authority to "say yes or no[.]" Wizel testified he could not recall a time when the GP Board "ever said no[,]" and he explained that TPC's management team made operational decisions for TPC. Wizel testified the GP Board never refused or delayed a turnaround.

Wizel testified that he is on the GP Board, and when making voting decisions as a director, he is acting on behalf of TPC. Wizel explained that Plaintiffs' allegations in their Fifth Amended Petition about the First Reserve Defendants' alleged control over the Port Neches facility's operations are inaccurate. Wizel testified the First Reserve Defendants did not control the operations at the Port Neches facility, provide managerial oversight of the operations, or operate or maintain any part of the Port Neches facility. Wizel testified that First Reserve does not have an ownership in TPC, and the Alpha entities and FR Sawgrass have indirect ownership interests in TPC. Wizel testified that TPC is a separate and distinct entity from the First Reserve Defendants, and no First Reserve Defendant has taken any distributions from TPC.

**Plaintiffs' Second Supplemental Response to Special Appearances**

Plaintiffs filed their Second Supplement to their Response to the Special Appearances of the Investors, arguing that Texas courts will disregard the corporate fiction under alter ego theory when a corporation is organized and operated as a mere tool or business conduit of another corporation. Plaintiffs argued that under the alter ego theory, personal jurisdiction may be established by imputing the jurisdictional contacts of a corporate entity to its owners or parent corporation. Plaintiffs explained that while Texas law generally presumes separate entities are distinct entities and that jurisdiction over a parent corporation does not automatically establish jurisdiction over a subsidiary, two or more distinct entities may be "fused" together when a parent entity controls the internal operations and affairs of the subsidiary to an extent beyond its role as an investor.

Plaintiffs argued that SK Sawgrass and Sawgrass Holdings are entity vehicles for SK Capital Partners to hold its investment in TPC and that SK Sawgrass, Sawgrass Holdings, SK Capital Partners, and the GP Board are interchangeable and one in the same. Plaintiffs explained that the deposition testimony of Jared Kramer ("Kramer"), a principal and Vice President of SK Capital Partners who offices in New York, shows he attended in person quarterly GP Board meetings at TPC's headquarters in Houston and considered TPC business. Plaintiffs explained that Kramer also attended monthly sponsorship review meetings in Houston relative to

SK Capital Partners' involvement with TPC. Plaintiffs argued that Kramer's testimony shows that SK Capital Partners has a "very substantial" investment and business interest in Texas through its portfolio of Texas-based chemical plants. Plaintiffs explained that SK Capital Partners' managing directors, Siadat and Norris, regularly attended the GP Board's meetings at TPC's Houston headquarters, and SK Capital Partners was "intimately involved in the management of TPC[]" due to the GP Board's "ultimate authority to approve (or not approve) whether and when a maintenance turnaround would occur" at the Port Neches facility.

Plaintiffs concluded that whether by disregarding the corporate fiction under the Texas alter ego theory, piercing the corporate veil, or fusing related entities, the Investors exercised substantial control over TPC and its day-to-day operations, vesting the MDL court with personal jurisdiction over them. Plaintiffs also concluded that the MDL court has specific jurisdiction over the Investors, which had purposeful contacts directly with Texas. In support of Plaintiffs' Supplement to their Response to the Investors' Special Appearances, Plaintiffs supplemented the record with the complete deposition transcripts of Macatangay, Ruth, Truzzolino, Pierce, Wizel, Siadat, Norris, and Kramer.

**SK Defendants' Reply to Plaintiffs' Response to Special Appearances**

The SK Defendants filed a Reply to Plaintiffs' Response to Defendants' Special Appearances, arguing that the attendance of individuals who work for other

distinct entities at the GP Board's meetings is insufficient to create specific jurisdiction since it does not signify control of TPC's internal business operations at the Port Neches facility. The SK Defendants argued that Plaintiffs failed to support their claim for specific jurisdiction because their jurisdictional evidence did not show a substantial connection between SK Sawgrass's alleged contacts with the forum and the operative facts of the litigation. The SK Defendants added that Plaintiffs' Response included no arguments about SK Second Reserve. The SK Defendants argued that Plaintiffs' conclusory assertions of corporate formalities being disregarded and control beyond a typical corporate parent are insufficient to overcome the presumption that separate entities are distinct for jurisdiction purposes. The SK Defendants argued that neither SK Sawgrass's minority limited partnership interest in Sawgrass Holdings nor Siadat's and Norris's board memberships justify imputing TPC's actions on SK Sawgrass.

In support of its Reply, the SK Defendants attached excerpts from the depositions of Pierce, Truzzolino, Norris, and Siadat. In Pierce's deposition, she testified that SK Second Reserve, which was formerly known as SK Capital Partners, had no Texas contacts and no relationship with TPC. Truzzolino, who provides accounting services to SK Capital Partners, testified that as SK Sawgrass's corporate representative, he never used SK Sawgrass's name to refer to SK Capital Partners. Norris testified he did not attend the GP Board's meetings on behalf of SK Capital

29

Partners. He also explained SK Capital Partners and SK Sawgrass did not invest in TPC and that no SK entity controlled or directed TPC's operations. Siadat testified that SK Capital Partners was based in New York and had a Florida office. Siadat testified that he attended the GP Board's meetings as a TPC director and not on behalf of SK Capital Partners, which had no investment in TPC. Siadat testified that no SK entity controlled TPC's operations.

**Hearing on the Special Appearances**

During the hearing the MDL court held on the Investors' special appearances, the Investors argued that the Plaintiffs failed to meet their burden to show the MDL court has personal jurisdiction over them. According to the Investors, the Plaintiffs failed to show the MDL court has specific jurisdiction over them because the evidence does not show a substantial connection between the forum contacts of each entity independently and the operative facts of the litigation. The Investors argued that Plaintiffs' evidence failed to show that any of them had a role in TPC's operation or maintenance.

As the Investors see, Wizel's testimony supports the conclusion that his contacts with TPC as a GP Board member cannot be attributed to First Reserve as a matter of law. The Investors argued that Plaintiffs failed to present evidence to support its theory that First Reserve ceased to be operated separately so that the corporate fiction should be disregarded to prevent fraud or injustice, and

30

consequently none TPC's or the GP Board's contacts may be attributed to the Investors. Finally, the Investors maintained that the Alpha entities and FR Sawgrass have no Texas contacts related to the litigation.

Plaintiffs argued that the MDL court has specific jurisdiction and that First Reserve's actionable conduct in Texas stems from its Houston managing directors making decisions while serving on the GP Board. Plaintiffs explained that they sued the Alpha entities and FR Sawgrass because they were used to purchase and hold interest in TPC which constituted the Texas contacts, and they are the vehicle in which First Reserve Management controls TPC. Plaintiffs argued that First Reserve directly controls the Alpha entities and FR Sawgrass, which are subject to jurisdiction because their actions are only directed toward their TPC ownership. Plaintiffs argued that their claims relate to the Investors' investments and management in Texas and to their Texas contacts, including their negligence and decision-making while serving on the GP Board.

The SK Defendants argued that Plaintiffs set forth no facts about jurisdiction of SK Second Reserve and that SK Sawgrass has no Texas contacts. The SK Defendants argued there is no general or specific jurisdiction over SK Sawgrass, and the evidence shows it had no role in operating or maintaining the Port Neches facility. The SK Defendants explained that Plaintiffs' facts relate to other non-party SK entities.

31

Plaintiffs explained they sued SK Second Reserve because they were formerly known as SK Capital Partners, but they intended to sue another entity called SK Capital Partners, a registered investment advisor, that currently exists. Plaintiffs admitted they did not know when SK Second Reserve and the former SK Capital Partners separated or when the current SK Capital Partners was formed and that they made a "misrepresentation error[.]" Plaintiffs explained that the current SK Capital Partners has some ownership interest in SK Sawgrass, which has an interest in the GP Board. Plaintiffs claimed that Siadat and Norris of SK Capital Partners control TPC's decisions and operations by acting on the GP Board.

The SK Defendants responded by noting that Siadat testified that he attended the GP Board meetings on behalf of TPC and that SK Sawgrass does not have any ownership in TPC or play any role in TPC's operations at the Port Neches facility. The SK Defendants stated that Siadat and Norris both testified that no SK entity controlled operations or provided any managerial oversight at the Port Neches facility.

**Plaintiffs' Supplemental Post-Hearing Briefing**

After considering the parties' arguments, the MDL court allowed Plaintiffs and the SK Defendants to submit additional briefing. In Plaintiffs' Second Supplement to Their Response to the Investors' Special Appearances, Plaintiffs included excerpts from the depositions of Kramer, Siadat, and Norris. Plaintiffs

argued that Siadat and Norris, who are both executives of SK Capital Partners, have a role in Sawgrass Holdings and in running the GP Board. Plaintiffs argued that SK Capital Partners is the ultimate parent company of TPC and that Siadat and Norris traveled to Texas to conduct TPC business on SK Capital Partner's behalf. Plaintiffs maintained that SK Sawgrass and SK Holdings are no more than shell entity vehicles for SK Capital Partners to hold its investment in TPC and that they are "interchangeable and one in the same." Plaintiffs argued that Siadat and Norris attending the GP Board's meetings showed SK Capital Partners controlled maintenance and turnarounds at the Port Neches facility.

**SK Defendants' Supplemental Post-Hearing Reply**

The SK Defendants filed a Supplemental Reply in Support of its Special Appearances in response to the MDL court allowing the parties to include the deposition testimony of four non-party witnesses, Kramer, Norris, Siadat, and Lukemire, who provided investment advisory services to two non-party entities. The SK Defendants argued that none of their testimony changes the "already-established fact that neither SK Second Reserve nor SK Sawgrass have any contacts or presence in Texas." The SK Defendants concluded that the record confirms they lack sufficient contacts with or presence in Texas to justify a finding of personal jurisdiction.

The MDL court denied the First Reserve Defendants' and the SK Defendants' special appearances.

## ANALYSIS

The First Reserve Defendants raise three issues on appeal. In issue one, the First Reserve Defendants argue that Texas courts do not have general personal jurisdiction over them because they are not headquartered in Texas and do not have principal places of business in Texas, and the fact that a non-resident defendant maintains an office in Texas is an insufficient basis for exercising general personal jurisdiction. In issue two, the First Reserve Defendants argue that Texas courts do not have specific personal jurisdiction over them because Plaintiffs' claims do not arise out of, or relate to the First Reserve Defendants' Texas contacts as there is no "substantial connection between those forum contacts" and "the operative facts of the litigation." In issue three, the First Reserve Defendants argue that none of them are a jurisdictional alter ego of TPC or the GP Board because the undisputed evidence demonstrates that no First Reserve Defendant exercised abnormal control over TPC or the GP Board, and Plaintiffs expressly disclaimed any theory of "fraud or anything like that."

The SK Defendants also raise three issues on appeal. In issue one, the SK Defendants argue that the MDL court does not have general personal jurisdiction over them. In issue two, the SK Defendants argue the MDL court lacks specific

34

personal jurisdiction over SK Second Reserve because it has no Texas contacts. In issue three, the SK Defendants argue the MDL court lacks specific personal jurisdiction over SK Sawgrass because it has no relevant Texas contacts and that Plaintiffs' specific-jurisdiction theory fails as a matter of law because it lacks evidentiary support.

**Standard of Review and Personal Jurisdiction Generally**

A nonresident defendant may challenge a Texas court's personal jurisdiction over it by filing a special appearance. Tex. R. Civ. P. 120a. "Whether a trial court has personal jurisdiction over a nonresident defendant is ultimately a question of law that we review de novo." *Oshman v. Wilkison*, No. 09-23-00201-CV, 2024 WL 1100005, at *5 (Tex. App.—Beaumont Mar. 14, 2024, no pet.) (mem. op.) (citations omitted); *see LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023) (hereafter "*LG Chem*"); *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court. *LG Chem*, 670 S.W.3d at 346; *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009); *Booth v. Kontomitras*, 485 S.W.3d 461, 476 (Tex. App.—Beaumont 2016, no pet.). If the plaintiff meets this initial

35

burden, defendant then bears the burden to negate all bases of personal jurisdiction alleged by plaintiff. *See LG Chem*, 670 S.W.3d at 346 (citing *Kelly*, 301 S.W.3d at 658). The defendant may negate the jurisdictional allegations on either a factual or legal basis. *Kelly*, 301 S.W.3d at 659.

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.* (footnotes omitted). If plaintiff does not plead facts bringing a defendant within reach of the Texas long-arm statute, defendant need only prove that it does not live in Texas to negate jurisdiction. *Id.* at 658–59 (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982)); *Booth*, 485 S.W.3d at 476. Thus the "paradig[m] . . . bases for general jurisdiction" over a foreign entity are its "place of incorporation and principal place of business." *Skylift, Inc. v. Nash*, No. 09-19-00389-CV, 2020 WL 1879655, at *3 (Tex. App.—Beaumont Apr. 16, 2020, no pet.) (mem. op.) (citation omitted).

Where jurisdictional facts are undisputed, we do not consider any implied findings of fact, instead we consider only the legal question whether the undisputed

36

facts establish Texas jurisdiction. *See Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When reviewing plaintiffs' jurisdictional allegations, we ask only whether the allegations are sufficient to invoke the exercise of personal jurisdiction over the defendant regardless of the claims' merits. *See Booth*, 485 S.W.3d at 477.

"A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem*, 670 S.W.3d at 346 (citing *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021)). Texas courts may exercise jurisdiction over a nonresident as authorized by the Texas long-arm statute and when consistent with federal due-process guarantees. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (Texas long-arm statute); *LG Chem*, 670 S.W.3d at 346; *Luciano*, 625 S.W.3d at 8. The Texas long-arm statute provides that a non-resident does business in the state if the nonresident commits certain acts in Texas, including, but not limited to, the following:

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. An allegation of jurisdiction may satisfy the Texas long-arm statute, but the allegation may not satisfy the United

States Constitution. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149. Therefore, even if a court determines the facts satisfy the Texas long-arm statute, the court must also examine the facts to determine whether the exercise of personal jurisdiction over the defendant comports with due process. *See CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). Personal jurisdiction is consistent with due process when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Kelly*, 301 S.W.3d at 657 (citation omitted).

The minimum contacts analysis requires "'some act by which the *defendant purposely avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The focus is on defendant's activities and expectations. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). A defendant's contacts may support either general personal jurisdiction or specific personal jurisdiction. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150; *Zinc Nacional, S.A. v. Bouché Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010).

**General Jurisdiction**

General jurisdiction arises when a defendant's contacts with the forum state are so "'continuous and systematic'" that defendant is "'essentially at home[]'" in

the forum state. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (citations omitted). This kind of personal jurisdiction allows courts to render a binding judgment against a defendant even if plaintiff's claims neither arise from activities conducted in the forum state nor "'relate to the forum [s]tate or the defendant's activity there[.]'" *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)).

**The MDL Court Does Not Have General Jurisdiction over the Investors**

The record shows the Investors are not organized under the laws of Texas and do not have principal places of business in Texas. Since the Investors are not organized under Texas law and do not have a principal place of business in Texas, the "paradig[m] . . . bases for general jurisdiction" are missing here. *See Skylift*, 2020 WL 1879655, at *3.

While Plaintiffs' jurisdictional allegations about First Reserve includes it maintaining a Houston office, the fact that a non-resident defendant maintains a Texas office is not a sufficient basis for exercising general, or all-purpose jurisdiction. *See Nunes v. NBCUniversal Media, LLC*, 582 F. Supp. 3d 387, 397 (E.D. Tex. 2022) (explaining that having one office, employees, and a general business presence in Texas are not substantial enough connections to create general jurisdiction in Texas); *Garcia Hamilton & Assocs., L.P. v. RBC Capital Mkts., LLC*, 466 F. Supp. 3d 692, 701 (S.D. Tex. 2020) (concluding no general jurisdiction in

Texas despite having four offices and 240 employees in Texas); *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (stating it is incredibly difficult to establish general jurisdiction in a forum other than defendant's place or incorporation or its principal place of business). Based on the evidence, we hold that First Reserve is not "so heavily engaged in activity" in Texas as to render First Reserve "at home" in Texas. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 405–06, 412–14 (2017) (citations omitted) (holding Montana did not have general jurisdiction over a Delaware railroad company having had a Montana facility with more than 2,000 employees, owning and operating more than 2,000 miles of railroad track in Montana, and advertising in Montana because it was not so heavily engaged in activity in Montana as to render it essentially at home in that state). Since this is not an "exceptional case" where First Reserve's Texas operations are "so substantial and of such a nature as to render it at home" in Texas, we hold that the First Reserve Defendants negated Plaintiffs' jurisdictional allegations and that the evidence does not support the MDL court's ruling to the extent that it based its ruling on a finding that it has general jurisdiction over First Reserve. *See id.* at 413; *see also Volkswagen Aktiengesellschaft*, 669 S.W.3d at 412.

As for the Alpha entities, FR Sawgrass, SK Second Reserve, and SK Sawgrass, the evidence shows that none of them had direct Texas contacts. We hold that the Investors negated Plaintiffs' jurisdictional allegations that the Alpha entities,

40

FR Sawgrass, SK Second Reserve, and SK Sawgrass had minimum contacts with Texas. *See Kelly*, 301 S.W.3d at 658–59. Thus, the MDL court does not have general jurisdiction over them. *See id.* We sustain the First Reserve Defendants' and the SK Defendants' first issue.

## Specific Personal Jurisdiction

Specific personal jurisdiction applies more narrowly than general jurisdiction. *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 412 (citing *Ford Motor Co.*, 592 U.S. at 352). Courts can exercise specific jurisdiction over a nonresident defendant when two conditions are met: (1) the defendant engages in some act by which it purposely avails itself of the privilege of conducting activities with the forum state; and (2) the plaintiff's claims arise out of or relate to those forum contacts. *Id.* at 412-13 (citing *Ford Motor Co.*, 592 U.S. at 352; *Luciano*, 625 S.W.3d at 8–9); *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007) (stating specific-jurisdiction analysis involves two co-equal components: purposeful availment and relatedness). This kind of personal jurisdiction involves a "'claim-by-claim'" analysis that focuses on the relationship between the defendant, the forum state, and the operative facts of the litigation. *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150); *see Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017) (citation omitted); *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 42 (Tex. 2016) (quoting *Walden v. Fiore*, 571 U.S.

41

277, 283–84 (2014)). We consider the "quality and nature of [these] contacts, rather than their number[.]" *Coleman*, 83 S.W.3d at 806 (citation omitted). We examine the Investors' purposeful conduct and contacts with Texas, rather than another's conduct and contacts with Texas. *See Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum state."). There must be a substantial connection between the nonresident's contacts and the operative facts of the litigation. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. A substantial connection may result, however, from a single purposeful act. *Id.* at 151–52. The operative facts are those on which the trial court will focus to prove the liability of defendant who is challenging jurisdiction. *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.).

**Purposeful Availment**

The first prong of specific jurisdiction, purposeful availment, is the "touchstone of jurisdictional due process[.]" *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 784. The purposeful availment analysis asks whether "'a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there.'" *See Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 152). "To show purposeful availment, a plaintiff must prove that a nonresident defendant seeks a benefit, advantage, or profit from the forum market." *In re Christianson Air*

42

*Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 679 (Tex. 2022) (citing *Michiana*

*Easy Livin' Country, Inc.*, 168 S.W.3d at 785). We apply three considerations to

determine purposeful availment:

- "[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person";

- "The contacts relied upon must be purposeful," not "random, fortuitous, or attenuated"; and

- The defendant "must seek some benefit, advantage[,] or profit by availing itself of [Texas's] jurisdiction."

*Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413–14 (quoting *Moncrief Oil Int'l,*

*Inc.*, 414 S.W.3d at 151). "'This analysis assesses the quality and nature of the

contacts, not the quantity.'" *Id.* (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151).

"Where the defendant has 'deliberately' engaged in significant activities within a

state, he 'manifestly has availed himself of the privilege of conducting business

there.'" *Luciano*, 625 S.W.3d at 9 (quoting *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 475–76 (1985)). Under certain limited circumstances, one entity's contacts

may be imputed to another entity for jurisdictional purposes, which we discuss

below.

**Jurisdictional Veil-Piercing/Alter Ego**

Texas law presumes that two separate corporations are distinct entities, and a

party seeking to ascribe one corporation's actions to another by disregarding their

distinct corporate entities must prove this allegation. *BMC Software Belgium, N.V.*,

43

83 S.W.3d at 798 (citations omitted). "Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). "'[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other[,]'" and "'100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations.'" *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007) (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)).

"[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary[.]" *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988) (other citation omitted)). "'[C]ases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes[,]'" and the "'degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.'" *PHC-Minden, L.P.*, 235 S.W.3d at 172–73 (quoting *Hargrave*, 710 F.2d at 1160). "[T]he evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *BMC Software Belgium, N.V.*, 83 S.W.3d

at 799 (citations omitted). We must examine all relevant facts and circumstances surrounding the operations of the parent and subsidiary to determine whether two separate and distinct corporate entities exist. *PHC-Minden, L.P.*, 235 S.W.3d at 173 (quoting *Hargrave*, 710 F.2d at 1160).

In determining whether a parent operates a subsidiary's facility, the United States Supreme Court has explained that "a participation-and-control test looking to the parent's supervision over the subsidiary, especially one that assumes that dual officers always act on behalf of the parent, cannot be used to identify operation of a facility[.]" *Bestfoods*, 524 U.S. at 70–71. The Supreme Court noted that "when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture[,]" "a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* at 71 (citations omitted). Since "'activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[]" are insufficient to show the parent operated the facility, the critical question is "whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72

45

(citations omitted). Thus, "acts of direct operation . . . must necessarily be distinguished from the inference that stems from the normal relationship between parent and subsidiary." *Id.* at 71.

**The MDL Court Does Not Have Specific Jurisdiction over the Investors**

Plaintiffs' allegations that the MDL court has specific jurisdiction over the Investors focuses on the Investors having exercised abnormal control over TPC's operations through the GP Board. To support their allegations, Plaintiffs rely on the Texas Supreme Court's opinion in *Cornerstone Healthcare Group Holding, Inc. v. Nautic Management VI, L.P.*, 493 S.W.3d 65 (Tex. 2016). In *Cornerstone*, defendants, three nonresident private-equity fund limited partnerships and their general partner, invested in a newly created Texas subsidiary that purchased a chain of hospitals from a Texas company. *Id.* at 67. The plaintiff, a Texas company allegedly in the market to buy the hospitals, asserted defendants' conduct was tortious and subjected defendants to Texas's jurisdiction over claims arising out of that conduct. *Id.* The *Cornerstone* Court held that Texas courts had jurisdiction over defendants. *Id.* While the *Cornerstone* Court agreed with the nonresident defendants that the Texas subsidiary's contacts could not be attributed to them because the subsidiary was a legally distinct entity, the Court concluded that the creation of the new subsidiaries to affect the consummation of the transactions contemplated by the

Asset Purchase Agreement was part of an "overarching transaction" in which defendants "specifically sought both a Texas seller and Texas assets." *Id.* at 72–73.

Confining its inquiry to specific jurisdiction, which requires a focus on the relationship among defendant, the forum and the litigation, the *Cornerstone* Court held defendants' contacts were purposeful and they sought some benefit, advantage, or profit by availing themselves of Texas's jurisdiction such that they impliedly consented to suit. *Id.* at 71, 73. The *Cornerstone* Court further held that plaintiff's causes of action arose from and related to defendants' purposeful contacts with Texas. *Id.* at 73–74. The *Cornerstone* Court explained that there was a "substantial connection between those contacts and the operative facts of the litigation[,]" because plaintiff's allegations concern defendants' use of plaintiff's confidential information to divert the transaction to themselves, the crux of defendants' purposeful contact with Texas and the focus at trial. *Id.* at 74. The Court reasoned the "deal did not stem from a third party's unilateral activity; it was the result of a transaction stemming from the activity of the respondents themselves." *Id.* at 73.

We hold that the *Cornerstone* case is distinguishable because as explained below, the Investors do not have purposeful contacts with Texas. *See id.* at 73-74. Additionally, unlike *Cornerstone*, the facts surrounding the TPC plant explosion is not the "crux" of the Investors' alleged contacts with Texas, which include owning

47

interests in separate and distinct entities and having directors on the GP Board that serve on TPC's behalf. *See id.* at 72-73.

In determining whether the MDL court has specific jurisdiction, we examine the Investors' purposeful conduct and contacts with Texas, rather than another's conduct and contacts. *See Walden*, 571 U.S. at 291. First, we note that the Alpha entities, FR Sawgrass, SK Second Reserve, and SK Sawgrass did not have any directors on the GP Board. Plaintiffs' allegations are based on the Alpha entities' ownership interests in FR Sawgrass and FR Sawgrass's ownership interests in two nonparty entities, the GP Board and Sawgrass Holdings, which have an ownership interest in TPC. Plaintiffs' allegations against SK Sawgrass are also based on its ownership interest in Sawgrass Holdings and its alleged connection with SK Capital Partners, and Plaintiffs' allegations against SK Second Reserve are only based on the conduct and contacts of SK Capital Partners, a nonparty Plaintiffs intended to sue.

Plaintiffs cannot base the Alpha entities', FR Sawgrass's, or SK Sawgrass's alleged purposeful conduct and contacts with Texas on the conduct and contacts of the GP Board and Sawgrass Holdings. *See id.* at 72-73. Nor can Plaintiffs base SK Second Reserve's and SK Sawgrass's alleged purposeful conduct and contacts with Texas on the conduct of SK Capital Partners. *See id.* at 73-74. Plaintiffs failed to provide evidence to overcome the presumption that the Alpha entities, FR Sawgrass,

48

SK Second Reserve, and SK Sawgrass are separate and distinct entities. *See PHC-Minden, L.P.*, 235 S.W.3d at 172–73; *BMC Software Belgium, N.V.*, 83 S.W.3d at 798. Without such evidence, the contacts of the GP Board, Sawgrass Holdings, and SK Capital Partners cannot be attributed to any of these entities. *See PHC-Minden, L.P.*, 235 S.W.3d at 172–73; *BMC Software Belgium, N.V.*, 83 S.W.3d at 798–99. We hold that since Plaintiffs failed to provide evidence that the Alpha entities, FR Sawgrass, SK Second Reserve, and SK Sawgrass cease to be separate so that their corporate fictions should be disregarded, Plaintiffs' jurisdictional allegations are insufficient for exercising specific jurisdiction over any of them. *See BMC Software Belgium, N.V.*, 83 S.W.3d at 799 (citations omitted). We also hold that Plaintiffs failed to prove the purposeful availment condition required for the MDL court to exercise specific jurisdiction over the Alpha entities, FR Sawgrass, SK Second Reserve, and SK Sawgrass. *See Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413–14 (citations omitted). We sustain the First Reserve Defendant's third issue in part, and we sustain the SK Defendants' second and third issues.

Plaintiffs' allegations against First Reserve are based on its two directors on the GP Board having exercised abnormal control over TPC's operations. The First Reserve Defendants rebutted Plaintiffs' allegations that: First Reserve was fused with TPC for jurisdictional purposes because of First Reserve's abnormal control over TPC's internal business operations and affairs; First Reserve's directors on the

GP Board were acting on behalf of First Reserve while fulfilling their director duties for TPC; and First Reserve exercised abnormal operational control over TPC and the Port Neches facility through the GP Board. Since Plaintiffs failed to provide evidence to overcome the presumption that First Reserve are separate and distinct entities, the contacts of TPC, First Reserve's directors on the GP Board, and the GP Board cannot be attributed to First Reserve. *See PHC-Minden, L.P.*, 235 S.W.3d at 172–73; *BMC Software Belgium, N.V.*, 83 S.W.3d at 798–99. Accordingly, we hold that Plaintiffs failed to prove the purposeful availment condition required for the MDL court to exercise specific jurisdiction over First Reserve. *See Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413–14 (citations omitted). We conclude the MDL court does not have specific jurisdiction over the Investors. We sustain the First Reserve Defendants' third issue in part. Having sustained issue three, we need not consider the First Reserve Defendants' issue two complaint that Plaintiffs' claims do not arise out of or relate to their Texas contacts. *See* Tex. R. App. P. 47.1

## CONCLUSION

Having concluded the MDL court does not have general or specific jurisdiction over any of the Investors, we further conclude the MDL court erred in denying the Investors' special appearances. Accordingly, we reverse the MDL court's orders denying the First Reserve Defendants' and the SK Defendants' special appearances and render the judgment the MDL court should have rendered,

50

dismissing Plaintiffs' claims against the Investors for lack of personal jurisdiction.

*See* Tex. R. App. P. 43.2(c).

REVERESED AND RENDERED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 30, 2024
Opinion Delivered June 27, 2024

Before Golemon, C.J., Horton and Wright, JJ.